JUANITA HIATT, Administratrix of Estate of JAMES HIATT, v. WABASH RAILWAY COMPANY, Appellant.—69 S. W. (2d) 627.

Division Two, February 23, 1934.

896·

*Homer Hall* and *Woodward & Evans* for appellant.

*Eagleton, Henwood & Waechter* and *Frank P. Aschemeyer* for respondent.

898

COOLEY, C.—Suit brought by James Hiatt to recover for personal injuries sustained while in the employ of defendant unloading steel rails from a car near St. Charles, Missouri, on February 23, 1929. Hiatt obtained verdict and judgment for $12,500, from which judgment defendant appealed. Later Hiatt died and the cause was revived here in the name of Juanita Hiatt, administratrix of his estate. We shall refer to James Hiatt as plaintiff.

The suit is founded upon alleged violation of the provisions of the Federal Safety Appliance Act relating to the use of air brakes.

Plaintiff was a member of a crew operating a train consisting of engine, tender and six cars. The work being done at the time of his injury consisted of dropping steel rails along defendant's railroad track which were to be installed in said track by a follow-up crew to replace the lighter rails then in use. The track upon which the train was operating and which was being rebuilt was defendant's main line track, used in interstate commerce, and it is not disputed that at the time of the accident plaintiff and defendant were engaged in interstate commerce.

The train in question had left St. Louis that morning, run westward to St. Charles where plaintiff boarded it and thence west about four miles, all over defendant's main line track, to the place where the unloading was to be done. Counting engine and tender as a car the train consisted of seven cars, designated by the witnesses in the following order, beginning at the west end of the train: No. 1, the caboose; No. 2, engine and tender; No. 3, car loaded with "green" steel; No. 4, flat car loaded with "regular" steel rails, which we shall call the steel car; No. 5, "loader" car on which was the derrick or hoist used to unload the rails; No. 6, a car of tie plates, and No. 7, one of angle bars. The rails and other materials were being distributed along the track. A rail would be unloaded, the train would then move westward one rail length, thirty-nine feet, stop and unload another rail, and so on. Some of the rails on the steel car projected over on to the west end of the loader car. Plaintiff was on the west end of the loader car, his work being to turn the rails with the ball of the rail up so that the tongs of the hoist or unloader could be fastened over it to lift and swing the rail from the car and lower it to the ground. He was standing bent over with one foot on a block or beam forming part of the foundation of the hoisting machinery and the other on the floor of the car, engaged in turning a rail, when an unusually hard jerking and jarring of the car caused his foot to slip from the block and to be caught and injured between the block and the rail. Plaintiff's evidence tended to prove that the jerking and jarring of the car and his consequent injury were proximately due to defendant's failure to have at least eighty-five per cent of the cars in the train equipped with air brakes connected so that they could be operated and the movements of the cars controlled by the engineer.

The unloading machinery was operated by air from the engine. The cars and engine all had air brake equipment. The air line on the four west of the loader car, counting engine and tender as one car, was connected so that their brakes could be operated by the engineer. But the air line was disconnected at the east end of the steel car (No. 4), so that no air could pass to the brakes of the loader car or the two cars east of it. An air hose leading to the unloading apparatus on the loader car was connected with the air line at the

east end of the steel car, through which air was supplied to that apparatus, thus breaking the air connection with the three east cars. It appears there was another hose on the loader car which could have been connected with the air line on the steel car so as to have connected the air line on the three east cars with that on the other four but it was not used. Appellant thus states the substance of plaintiff's evidence on that point:

"The cars were equipped with an air line and hose, by means of which the air could be brought into the power brakes on the loader car and the two cars east of it, referred to as cars 5, 6 and 7. That hose line was not in use at the time of the injury. There was an airline hose on the hoist car which could have been used, which would have hooked up the steel car and hoist car if it had been used."

It will be seen that whether the engine and tender be counted as a car or not at least fifty per cent, but less than eighty-five per cent, of the cars in the train had functioning air brakes. Defendant offered no evidence, standing upon its demurrer to plaintiff's evidence. Other facts will be stated in connection with the points to which they pertain.

I. Appellant contends that the train operation which caused plaintiff's injury was not a train movement within the meaning of the statute and that the statute does not apply. The applicable Federal statutes are Sections 1 and 9 of Title 45, U. S. C. A. Section 1 provides that it shall be unlawful for any common carrier engaged in interstate commerce by railroad to "run any train in such (interstate) traffic . . . that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." Section 9 reads:

"Whenever, as provided in this chapter, any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said 50 per centum shall have their brakes so used and operated; and, to more fully carry into effect the objects of said chapter, the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid; and failure to comply with any such requirement of the said Interstate Commerce Commission shall be subject to the like penalty as failure to comply with any requirement of this section."

The action being bottomed upon the Federal statute the construction given the statute by the Federal courts governs. The only

Federal decisions called to our attention or that we have found in which it was held the movement in question was not a train movement within the contemplation of the statute are cases in which the movement involved was a switching movement, such as breaking up or assembling trains in yards or similar movements that might properly be denominated switching movements. Thus, in United States v. Erie Railroad Co., 237 U. S. 402, the court had before it a case involving the movement of transfer trains between switch yards two or three miles apart where there were many switch tracks and where many trains were broken up and others assembled. It was necessary to transfer cars from one yard to another and this was done by trains called transfer trains, usually composed of about twenty-five cars, having no caboose and operated by engines and crews specially engaged in that service. Between yards a transfer train moved as a unit over tracks used as main tracks for freight but not for passenger trains. While so moving the transfer train was subject to the hazards that confronted regular trains in the busy sector through which it moved. In holding that it was subject to the air brake provisions the court said:

"It will be perceived that the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car. As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains and whereby incoming trains which have completed their runs are broken up. These are not train movements but mere switching operations, and so are not within the air-brake provision." [237 U. S. 1. c. 407.]

After describing the conditions and hazards under which the transfer train operated, the court said further, 237 U. S. 1. c. 408:

"Thus it is plain that, in common with other trains using the same mainline tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements. The original act prescribed that these appliances should consist of air brakes controlled by the engineer on the locomotive, and the Act of 1903 declared that this requirement should 'be held to apply to all trains.' We therefore conclude and hold that it embraced these transfer trains."

In United States v. Chicago, B. & Q. Railroad Co., 237 U. S. 410, the court for similar reasons held that a transfer train between switching yards about two miles apart, both of which were used for receiving and breaking up incoming and assembling outgoing trains,

and between which it was necessary to transfer cars, was within the act. The court said, 237 U. S. 1. c. 412:

"And not only were these (transfer) trains exposed to the hazards which that provision (of the statute) was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally designed to protect."

In United States v. Texas & N. O. Railroad Co. (D. C.), 13 Fed. (2d) 429, cited by appellant, the movement under review was conducted on a track used mainly as a feeder for industries but partly for main line purposes. It was held that it was not within the safety appliance statute but that holding was because the movement under the circumstances was deemed to be essentially and in effect a switching operation.

In United States v. Northern Pacific Ry. Co., 254 U. S. 251, a transfer train moving as a unit between yards was held to be within the act though not operating on a main line. The court said, 254 U. S. 1. c. 254:

"But there is nothing in the act which limits the application of the provision here in question (air brake provision) to operations on main line tracks. The requirement that train brakes shall be coupled so as to be under engine control is in terms . . . applicable to 'all trains . . . used on any railroad engaged in interstate commerce.' . . . The cases cited show that transfer trains, like those here involved, are 'trains' within the meaning of the act. A moving locomotive with cars attached is without the provision of the act only when it is *not* a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

See, also, to like effect, Ill. Central Railroad Co. v. United States (C. C. A.), 14 Fed. (2d) 747; Louisville & Jeffersonville Bridge Co. v. United States, 249 U. S. 534. In each of the foregoing cases the court seems to have regarded the fact that the train, throughout the operation in question, moved as a unit, while perhaps not alone controlling, as tending strongly to characterize the movement under review as a train movement rather than a switching movement, and within the statute.

In the instant case the train moved as a unit. Cars were not being cut out or inserted nor was such operation intended. In traveling over defendant's main line from St. Louis to St. Charles and thence to the place where the unloading was to begin the train was clearly making a train movement. Thereafter, while each movement was short, the train moved each time as a unit and was operating on the main line over which defendant's regular trains were moving in the regular course of its business, which traffic was not interrupted

or detoured on account of the work being done. Whenever necessary in order to permit other trains to pass this train had to go to some sidetrack in order to clear the main line track, which of course required it to travel over the main line to such siding. In all these movements it appears to us it was important for the protection and safety of the persons on this train and of persons and property on other trains using said main line that the train in question should have been under the control of the engineer as contemplated by the statute. According to plaintiff's evidence, as above shown, it would not have been impracticable in this instance to have had the loader car and the two cars east of it connected with the air line on the other four cars. But we do not rest our decision on that proposition. If the movement in question was a train movement within the meaning of the statute defendant had the mandatory duty to comply with the statutory requirement. [Penn. Co. v. United States (C. C. A.), 241 Fed. 824, 830; St. Louis & Iron Mountain Ry. Co. v. Taylor, 210 U. S. 281, 295.]

In N. Y. Central Railroad Co. v. United States, 265 U. S. 41, 43, the court, referring to the statutory provisions here invoked, said:

"Pursuant to authority conferred upon it by the Act of 1903, the Interstate Commerce Commission, November 15, 1905, ordered that the minimum prescribed by the act be increased to 75 per cent; and, on June 6, 1910, ordered it increased to 85 per cent. . . .

"The acts of Congress and orders of the Commission above referred to should be liberally construed to relieve trainmen of the labor and danger involved in the use of hand brakes to control the speed of trains and to promote the safety of trains and of persons and property thereon."

In our opinion the movement here in question was a train movement within the purview of the statute and the requirement as to air brakes applies.

■ II. Pursuant to the express authority conferred by the statute, Section 9, supra, the Interstate Commerce Commission, by order dated June 6, 1910, increased the minimum percentage of cars in any train required to be operated with power brakes to eighty-five per cent. Plaintiff's case rests upon defendant's failure to meet the increased minimum requirement thus ordered, as his evidence shows that at least fifty per cent of the cars were properly equipped and connected as originally required by the statute. The commission's order of June 6, 1910, was not introduced in evidence nor did plaintiff introduce evidence showing its promulgation. Respondent insists that the courts will take judicial notice of it; appellant contra. We agree with respondent's contention. The order of the commission was made pursuant to express statutory authority and it is provided in the statute that "failure to comply with any such requirement of the said Interstate Commerce Commission shall be subject to the

like penalty as failure to comply with any requirement of this section." The order of the commission when made thus had the force of law. In Cassarello v. United States (D. C.), 271 Fed. 486, 488, the court, discussing certain regulations made by the Director of the Bureau of War Risk Insurance, said: "Furthermore, rules and regulations prescribed by a department of the government in pursuance of a statutory authority, have the force of law," citing several Federal cases. To same effect see United States v. Grimaud, 220 U. S. 506; Colyer v. Skeffington (D. C.), 265 Fed. 17, 28.

In Caha v. United States, 152 U. S. 211, 221, it is said:

"The rules and regulations prescribed by the Interior Department in respect to contests before the Land Office were not formally offered in evidence, and it is claimed that this omission is fatal, and that a verdict should have been instructed for the defendant. But we are of opinion that there was no necessity for a formal introduction in evidence of such rules and regulations. They are matters of which courts of the United States take judicial notice. Questions of a kindred nature have been frequently presented, and it may be laid down as a general rule, deducible from the cases, that wherever, by the express language of any act of Congress, power is entrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect to which they have a right to participate, and by which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice."

The Vermont Supreme Court, in Goulette's Admr. v. Grand Trunk Ry. Co., 93 Vt. 266, held that the court would take judicial notice of regulations promulgated by the Interstate Commerce Commission fixing standards for equipping cars with safety appliances pursuant to authority conferred by the Safety Appliance Act, citing Caha v. United States, supra.

So our own court, in Division One, in Huckleberry v. Mo. Pac. Ry. Co., 324 Mo. 1024, 26 S. W. (2d) 980, 986, said: "Judicial notice is taken of such orders and regulations" (of the Interstate Commerce Commission made pursuant to statutory authority), citing the Caha case and other Federal decisions and the Goulette case, supra. Appellant argues that said statement in the Huckleberry case is purely *obiter*. We are not so persuaded, but in any event we think it correctly applies the Federal rulings on this point and we are dealing with a case governed by the Federal statutes and decisions. See also Cosmos Exploration Co. v. Gray Eagle Oil Co., 190 U. S. 301, 309, holding that judicial notice will be taken of rules and regulations of the Land Department made pursuant to statutory authority regarding sale or exchange of public land.

Appellant cites, among others, Robinson v. B. & O. Railroad Co., 222 U. S. 506. That case holds that the Federal statute making the published reports of the commission *"competent evidence* of the reports and decisions of the Commission therein contained . . . without any further proof or authentication thereof," makes such reports and decisions admissible in evidence without other proof of their genuineness but does not require that they be judicially noticed "or relieve litigants from offering them in evidence as they would any other competent evidence intended to be relied upon." The court was not there considering an order of the commission made pursuant to express authority of the statute and which, by the terms of the statute, when so made has the force of law,—becomes in effect a part thereof. The Caha case is not mentioned in the Robinson case and evidently was not deemed in conflict with the ruling there made. The Caha case has been cited with approval on the point of judicial notice in decisions of the same court subsequent to the Robinson case. [See Givens v. Zerbst, 255 U. S. 11, 18; Thornton v. United States, 271 U. S. 414, 420.]

Appellant quotes from 1 Jones' Commentaries on the Law of Evidence (2 Ed.), section 388:

"With the great increase in recent years of the paternalistic trend of government, however, numerous tribunals of quasi-judicial or quasi-administrative purpose have come into being, the decisions of which, together with the rules and regulations laid down for their own internal regulation and the regulation of matters within the peculiar scope of their powers, are not uniformly accorded judicial recognition. *Where the rules and regulations of administrative departments or tribunals and commissions of like nature are promulgated under express statutory authority, they may be said, in effect, to become part of the law of the jurisdiction and to require notice as such;* likewise, notice has sometimes been accorded on the ground that certain reports were published 'by authority of law.' But no rule can be said to be established as yet governing all such cases. Notice has been taken of rules, regulations and decisions of various departments of the federal government, but refused as to certain acts; while, *as to decisions of the Interstate Commerce Commission, it seems to be an established rule that reports and rate rulings of that body are not noticed."* (Italics ours.)

We think the rule stated, as applied to the facts of this case, is against rather than for appellant.

Appellant also cites Banaka v. Mo. Pac. Ry. Co., 193 Mo. App. 345, 186 S. W. 7. That case cites and follows, without discussion, Robinson v. B. & O. Railroad Co., supra, without mention of the Caha case. We shall not lengthen this opinion by analysis of the facts of the Banaka case or discussion of whether it correctly applies the holding in the Robinson case. If and in so far as the Banaka case runs

counter to the rule announced in the Caha case we disapprove it. Neither shall we take space to analyze or discuss City of St. Louis v. Kruempeler, 235 Mo. 710, 139 S. W. 446, cited by appellant. We think it distinguishable from the instant case. In Moss v. Wells (Mo.), 249 S. W. 411, also cited, two of the four judges of Division One concurred in the result only so it does not appear that there was a decision on the question of judicial notice there involved. We think that in this action, based upon alleged violation of the Safety Appliance Act and an order of the Interstate Commerce Commission made pursuant to express authority of the act, the court should take judicial notice of such order and that the learned trial court did not err in so doing.

■ III. Appellant complains that Instruction 2 on the measure of damages does not limit the recovery for loss of earnings "either to the amount alleged in the petition or to the amount shown by the evidence," and therefore gave the jury a roving commission to allow any amount for such loss. Appellant cites no authorities on this point. The petition alleges that at the time of his injury plaintiff was earning $100 per month, "with good prospects of advancement." Plaintiff's evidence was that he was earning somewhat less than $100 per month. Said Instruction 2 limits the recovery for loss of past and future earnings to such amount as the jury might find "from the evidence" would reasonably compensate him for such loss, if any. Defendant asked no instruction on that subject. On similar facts, where the plaintiff's evidence tended to show loss of earnings less than the amount claimed in the petition, the failure of the plaintiff's instruction specifically to limit the recovery for loss of earnings to the amount named in the petition was held not to be reversible error in Laycock v. United Rys. Co., 290 Mo. 344, 235 S. W. 91 (en banc). [See, also, to same effect, Leighton v. Davis (Mo.), 260 S. W. 986.] In the Laycock case the question is discussed at length. Both cases are in point. We rule this contention against appellant.

■ IV. Plaintiff's witness Fowler, who had operated the hoist, was permitted, over defendant's objection that he was not shown to be qualified, to testify that a train such as that in question, if equipped throughout with air brakes, can be brought to a slow, easy stop but if not so equipped it stops with hard jerks. Fowler testified that he had worked "on this job" and had observed trains "working with and without air" for three weeks before the accident and had previously worked on trains doing the same class of work "where they have had air." "Q. Over what period of time or how long had you been watching that sort of situation? A. Well, off and on, for four years." The witness was not asked further as to the extent of his experience and observation during the four-year period.

Another witness, Martin, who had had twenty-two years experience as fireman, assistant superintendent of locomotive performance and engineer, had operated passenger, freight and work trains and whose qualification was not disputed, testified to the same effect in answer to hypothetical questions based upon the size, equipment and air connections of the train in question.

We are inclined to think Fowler's testimony was properly admitted. While he had not himself operated trains he had worked upon and about them when operated with and without air and had observed their operation over a considerable time. [See Wolff v. Scullin Steel Co. (Mo. App.), 217 S. W. 571; Ellis v. Met. St. Ry. Co., 234 Mo. 657, 684, 138 S. W. 23.] Moreover, in the circumstances of this case, defendant having offered no evidence and Fowler's testimony on this point being merely cumulative proof of the facts shown by Martin's testimony, which was not discredited, we think the admission of Fowler's testimony, even if erroneous, could not have been prejudicial to defendant and therefore would not justify reversal. [Drake v. K. C. Pub. Serv. Co., 333 Mo. 520, 63 S. W. (2d) 75, 81, and cases cited; Trembley v. Fidelity & Casualty Co. (Mo. App.), 243 S. W. 201.]

■ V. Finally, it is urged that the verdict is excessive. Plaintiff's evidence tended to show that at the time of his injury he was about twenty-two years old and physically sound. His foot and ankle were seriously injured though no bones were broken except that a small particle of bone to which a ligament was attached was torn off. About three months after his injury, when Dr. Jenkins began treating him, "his foot was red and somewhat swollen, seemingly very tender over his ankle, and the lower part of his leg stiff." He could not walk without a decided limp and there was considerable inflammation about the ankle joint. His foot was then placed in a plaster cast and so kept for two and a half months. Dr. Jenkins began a course of treatments which he continued for nearly a year. For about a year after his injury plaintiff used crutches and at the time of the trial, twenty-one and a half months after his injury, he had to use a cane. He testified that his foot and ankle had continually caused him pain if he attempted to use the foot; "if I try to walk on it or step on it, it hurts me all the time, and swells up. . . . It runs all the way up into my leg and hip." At the time of the trial there had been improvement in the condition of the foot and ankle but there remained a considerable loss of motion, a flattening of the arch of the foot, and the bones of the foot had become "more or less atrophied,—that is, a little smaller than they should be," due to the inability to use the foot. Dr. Jenkins estimated that there was thirty or forty per cent limitation of motion of the ankle joint. X-ray pictures showed "some arthritis, also some thickening and rough-

ening of the small bones of the foot, with a small piece of bone pulled loose from the top of one of these small bones, and a great deal of atrophy of the bones. That is, the bones are thinned out." The pictures also showed some deformity of the ankle joint. Dr. Pernoud, who examined plaintiff just before the trial, testified that the whole foot and leg were atrophied; "that it is wasted and smaller in size than the other leg;" that "the up and down motion of the foot is fairly good; I would say it is limited 20 per cent, but the lateral movements of the foot are entirely gone." The evidence tends to prove that the conditions existing at the time of the trial were permanent and were such as would cause plaintiff pain in using his foot and would handicap him in doing manual labor; that he would not in the future be able to do the kind of work he had previously done "over periods of eight hours; and under his present condition he wouldn't be able to do that work at all."

At the time of his injury plaintiff was earning $3.20 per day, approximately $1000 per year if he worked regularly except Sundays. At that rate he had lost in earnings up to the time of trial between $1700 and $1800 and had incurred $214 expense for treatments to his injured foot. He had not been able to do manual labor since his injury and it does not appear that he was qualified to earn money otherwise.

In Johnson v. Chicago & Eastern Ill. Ry. Co., 334 Mo. 22, 64 S. W. (2d) 674, we pointed out that "while there can be no fixed standard for the measurement of damages resulting from personal injuries, this court has not ordinarily allowed a judgment to stand for more than $10,000 for the loss of a leg below the knee, unless there were other injuries or aggravating conditions tending to increase the damages ordinarily incident to such injury." In this case the plaintiff's ankle and foot were seriously injured and permanently impaired, causing permanent impairment of his earning capacity, which injury, the evidence indicated, would continue to cause him pain. But, as said of a somewhat similar injury in Spencer v. Quincy, O. & K. C. Railroad Co., 317 Mo. 492, 505, 297 S. W. 353, 357, "a leg with a weak or impaired ankle is better than no leg at all" In view of our former holdings on this question we think $10,000 is the maximum recovery that can be permitted in the instant case. [See Johnson v. Ry. Co., supra, and cases cited; Spencer v. Railroad Co., supra; Jordan v. East St. L. Connecting Ry. Co., 308 Mo. 31, 271 S. W. 997.]

The judgment of the circuit court is affirmed on condition that respondent, within ten days, enter as of the original date thereof, a *remittitur* of $2,500, leaving the judgment stand for $10,000, with interest on said sum from date of judgment, otherwise the judgment is reversed and the cause remanded. *Westhues, C.,* concurs; *Fitzsimmons, C.,* not sitting.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.