BEN HARRISON v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—99 S. W. (2d) 841.

Division One, November 12, 1936.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee* for appellant.

*Cope & Hadsell, Cowgill & Popham* and *John F. Cook* for respondent.

826

BRADLEY, C.—This cause, for personal injury, is under the Federal Employers' Liability Act (45 U. S. C. A., Sec. 51 et seq.). Plaintiff, a locomotive fireman, obtained verdict and judgment for $40,000. Motion for new trial was overruled and defendant appealed. It is

conceded that, at the time plaintiff was injured, both he and defendant were engaged in interstate transportation.

Plaintiff was injured about four A. M., May 14, 1930, when he was preparing to put coal in the furnace of the boiler. The accident occurred between Okmulgee and Muskogee, Oklahoma, while the freight train was traveling east, and a short distance east of a siding or switch known as Mowery. The negligence alleged and submitted is that defendant failed to exercise ordinary care to keep its track and roadbed in a reasonably safe condition and in running the train over this track and roadbed at an excessive rate of speed. The answer is (1) a general denial; (2) assumed risk, and (3) contributory negligence. Reply is a general denial.

Error is assigned (1) on the admission and exclusion of evidence; (2) on giving instructions; (3) on argument of counsel, and (4) on an alleged excessive verdict.

Defendant does not assign error on the refusal of its peremptory request for a directed verdict at the close of the case, but says that "the verdict was against the great weight of the evidence and justice demands that all the rulings of the trial court be closely scrutinized for prejudicial error." Plaintiff, prior to his injury, had been in the employ of defendant as a fireman for about seven years. The train plaintiff was firing ran between Muskogee and Okmulgee, and consisted of about twenty-three cars, and according to plaintiff, was running about thirty miles per hour at the time he was injured. He testified that he had just stepped down from the fireman's seatbox to put in coal and had taken the shovel and was partly stooped over getting the coal with the shovel, when the engine suddenly dipped down and up and he was thrown on the floor of the cab, receiving the injuries complained of. Plaintiff's evidence tended to show that the ties and roadbed where this dip occurred were out of repair and defective and in such condition as would probably cause a dip such as he says occurred. He had been on this run for about two weeks and had not, prior to his injury, been standing on the engine deck while passing over the place in question, and he said that, in his opinion, the engine dipped as much as four or five inches; that "it would have to go as much as four or five inches to throw a man." Plaintiff was corroborated as to the condition of the track and roadbed. Defendant's evidence tended to show that the track and roadbed at the place were in good condition and that there was no place near where plaintiff claims to have been thrown because of the sudden dip, where there could be a dip exceeding a quarter of an inch, but defendant concedes, in effect, that the question as to the condition of the track and roadbed was one of fact, hence it will not be necessary to pursue the subject of the condition of the track and roadbed further, except as occurs in the consideration of the separate assignments.

■ On the admission of evidence: Plaintiff's witness, Bert Green, testified he fired a freight train over this same stretch of track "within a day or two" after plaintiff was injured; that plaintiff's misfortune had been called to his attention and that because of this information he "noticed that condition there." Green was asked this question: "Taking the few hundred feet of track east of Mowery, mile post 486, I want you to tell the jury just what you noticed about that after this was called to your attention immediately after this man was hurt there?", and answered: "Well, there was a dip there." After he had answered defendant objected "on the ground that it is subsequent to the date of the alleged accident." The objection was overruled and defendant saved exception, but did not move to strike, and plaintiff makes the point that defendant, failing to move to strike, is in no position to complain. Such is the rule. [Brackett v. James Black Masonry & Contracting Co., 326 Mo. 387, 32 S. W. (2d) 288, l. c. 290; Garvey v. Piel et al. (Mo.), 43 S. W. (2d) 774; Boyd v. Kansas City, 291 Mo. 622, 237 S. W. 1001, l. c. 1009; Radler v. St. Louis-S. F. Ry. Co., 330 Mo. 968, 51 S. W. (2d) 1011.] ■ But witness Green further testified, and of the same occasion, that the engine at the place "would rock down and then back." Objection was made to this on the ground that it was subsequent to the time of plaintiff's injury. Also, plaintiff introduced some photographs of the track, at and immediately east and west of Mowery, taken after plaintiff's injury. Objection was made to these on the ground that there was "nothing to show that the condition then is the same as at the time of this accident." Plaintiff's witness, Cole, a railroad man of many years experience, including service as fireman and engineer, testified that shortly after plaintiff's injury (the inference is in the next day or two thereafter) he was at the Mowery switch and examined the track several hundred feet both east and west, and that the photographs fairly represented the situation as he saw it when there. He further testified that the ties were rotten and that there was considerable play in the rails. "Well, some of them (ties) was rotten; you could walk along there and pick them out like that (indicating); there was that much play there in the rails where they would play up and down. Q. What is the fact whether or not those joints were supported? A. Well, the joint worked up and down so much and gravel and ballast had worked out from under so much they had play there. Q. From your experience as an engineer and track man and in the various capacities you have worked for railroads, I want you to tell the jury whether or not in your opinion such a condition would have a tendency to throw a fireman from his position going at a speed of twenty-five to thirty miles an hour? A. Absolutely." James Dudley, plaintiff's witness, whose experience in railroad work covered a period of thirty-six or thirty-eight years, including service as foreman of section crews, testified: "Q. Now, in

connection with the question Mr. Conrad asked you about where the. joint is so improperly supported that with the tender of an engine passing over it, it will drop four or five inches and rebound and where the weather has been good for some time before that, is that a condition, in your experience and judgment, that comes suddenly or overnight, or is it a thing a long time in existence? A. Well, all the experience I have ever had, it has been of a long duration.'"

"As a general rule proof of the existence of a present condition or state of facts does not raise any presumption that the same condition or facts existed at a prior date." [22 C. J., p. 92, sec. 30.] "Ordinarily, proof of a present condition standing alone is not presumptive evidence of its existence theretofore." [Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, l. c. 146, 31 S. W. (2d) 21.] But the evidence in the present case as to the subsequent condition of the track, including the photographs, does not stand alone. As appears, supra, the witness Dudley testified that the condition, described to him, had, in his opinion, been of long duration. Also, it appears that the observation as to the subsequent condition was only a day or two after plaintiff's injury. We think the situation here is parallel in principle to what was said in Bailey v. Kansas City, 189 Mo. 503, 87 S. W. 1182, where it was ruled that: "If defects are of such character, as for example, a decayed condition of stringers or of boards, the rusting off of nails, or the rotting out of nail holes, and the consequent loosening of boards, as to show that the condition was the gradual and joint product of time and neglect, proof of that condition subsequent to the accident but so near thereto as to indicate that the same condition existed at the time of the accident, is admissible." The situation here is entirely different to that obtaining in the Conduitt case, supra. There, the subsequent condition, as to which evidence was admitted, was seventeen months after the injury, and in that case it was held that such was "going too far." Under the facts here we do not think that error was committed in the admission of the evidence as to the subsequent condition of the track and roadbed.

In the assignment on the admission of evidence defendant further complains of the evidence of plaintiff that the "up and down movement," when he was injured was "an extraordinary movement of the engine;" and of the evidence of plaintiff's witnesses, Green and Cole, that a fireman would likely be thrown by increasing the speed over the stretch of track in question from twenty to twenty-five miles to thirty miles per hour. Also defendant complains of the admission of the evidence of plaintiff's witness, Green, that the condition in which he found the track would take "weeks and months to accumulate." Defendant says that all such evidence was in the nature of conclusions; and invaded the province of the jury. This evidence was merely opinion evidence, given by experienced railroad men. Plaintiff had fired an engine for seven years, and had worked on the section, in the

shop and had been brakeman. Green had had some twenty-five years' experience in railroad service; had worked on the section and had been fireman "for a number of years." Cole, likewise was an experienced railroad man, with a service of twenty years; had been section man, machinist's helper, pipefitter, boilermaker, blacksmith, fireman and engineer. In a recent case, Williamson v. St. Louis-S. F. Ry. Co., 335 Mo. 917, 74 S. W. (2d) 583, we had a question similar to the one here. There we ruled: "The witness had twenty-five years' experience on locomotives and as a switchman. We think he was qualified as an expert to testify with reference to the automatic coupling of cars. The testimony was not the conclusion of the witness. In testifying he only gave his opinion about the matter. The question was a matter for expert evidence, and it was proper to permit the witness to answer." And in Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, there was a similar question. In the Young case error was assigned on the admission of the opinion of the engineer used as an expert. as to what speed "of such a train on such a grade and curve under various conditions would tend to cause derailment." In ruling the assignment we said: "We think that these matters were proper subjects for expert testimony. Such matters are not within the experience of average jurors. One test of whether opinions of experts should be received 'is whether the court or jury will be aided by receiving such evidence.' [22 C. J. 642, sec. 736.] 'The necessity for such testimony arises where the subject matter of an inquiry is so far removed from the realm of common experience that the ordinary jury, even when the facts are fully placed before them, cannot fairly be expected to draw a correct inference therefrom, and at the same time, no person competent to draw such an inference has personal knowledge of the facts. Under such circumstances the fact that a witness possessing the necessary skill would draw a certain inference from the facts possesses such probative force as justifies its reception as some evidence that such inference is the correct one.' " [See, also, Hiatt v. Wabash Ry. Co., 334 Mo. 895, 69 S. W. (2d) 627.] We do not think that the evidence of these witnesses falls within the class of conclusions, but was opinion evidence given by those, qualified by experience to give their opinion.

■ Defendant, among the assignments based on the admission of evidence, assigns on a question asked plaintiff on redirect examination. Plaintiff was asked: "And during the times you had gone over that, had you ever seen any train go over that particular stretch of track there at any speed faster than twenty-five miles an hour, other than this particular time?" Objection was made to this question on the ground that it was leading and suggestive. The objection was overruled and defendant saved exception. The question was then reframed: "Had you until that day seen it going at any speed faster than twenty-five miles an hour?" and plaintiff answered, "No, sir."

No objection was made to the question as reframed, but there is no distinction in substance between the two questions. When an objection to the introduction of evidence has been squarely made, it is not necessary to follow up with repeated objections in order to save the point. [Bailey v. Kansas City, supra; Elsea v. Smith, 273 Mo. 396, l. c. 409, 202 S. W. 1071.] ■ The question complained of was somewhat leading, but the approval or disapproval of leading questions is largely discretionary with the trial court, and will not constitute reversible error, unless the discretion is abused. [Howlett v. Randol (Mo. App.), 39 S. W. (2d) 463; Coats v. Lynch, 152 Mo. 161, 53 S. W. 865; Pritchard v. Thomas (Mo.), 192 S. W. 956.] We do not think that defendant was seriously prejudiced by the leading character of the question.

■ Error is assigned on the refusal of the trial court to permit defendant to introduce in evidence the whole deposition of plaintiff taken by defendant November 14, 1931. The deposition, as stated by counsel, was offered for three purposes: "First, for impeachment purposes; secondly, as admissions made by the plaintiff; and thirdly, as bearing upon the shedding light upon his credibility as a witness, which is an issue in this case of great materiality, and for the determination of the jury, and in doing so I am offering the entire deposition because even though there may be some immaterial matters in the deposition, the whole deposition is necessary and relates more clearly matters and situations the purpose for which the offer is made." Objection was made to the introduction of the deposition as a whole on the ground that there was much in the deposition that was irrelevant and immaterial and much that was not contradictory to plaintiff's evidence and much in the deposition that in no wise tended to show admissions against interest. The court ruled that defendant could introduce such portions of the deposition "as impeach the testimony of plaintiff, but further, any such portions of the deposition as are admissions against the interest of the plaintiff; of course, limiting the introduction to such matters as are relevant and material." Upon the court so ruling defendant did not offer any specific portions of the deposition, but selected a question on the tenth printed page thereof and offered the remainder as a whole. Plaintiff's counsel made the same objections as when the deposition was offered as a whole and were sustained, and defendant saved exception. The portion offered as a whole covers nearly thirty-eight pages of the printed record and contains much that is wholly irrelevant and immaterial and much that is in no wise contradictory to plaintiff's evidence, and much that in no wise tends to show admissions against interest. When counsel for defendant had offered the thirty-eight pages as a whole, the record shows: "THE COURT: Mr. Conrad, can you point out any particular part of the deposition offered that contradicts anything he said upon the stand? MR. CONRAD: Oh, yes,

counsel admits there is something contradictory, but I am not prepared to pick it all out; if it is illustrative, I will point it out as illustrative. THE COURT: If you will point out the parts that are contradictory—MR. CONRAD: (Interrupting): Well, your Honor, I am declining to rest it on that ground alone. THE COURT: Well, of course, we get back to the question of whether there is any admission against interest that he hasn't already admitted; if there is anything in the deposition which is an admission against interest which he hasn't already admitted on the stand, the Court will admit it. . . . MR. CONRAD: Well, there is a great deal in there that is so interspersed through the deposition that it is impracticable for me to comply, and neither do I think it meets the purposes of the offer.''

''When an offer of evidence is mixed with matters clearly incompetent, the trial court is not required to sort out the competent from the incompetent, but it can reject the whole offer.'' [Lynch v. M. K. & T. Railroad Co., 333 Mo. 89, 61 S. W. (2d) 918, l. c. 923, and cases there cited.] In Peppers v. St. Louis-S. F. Ry. Co., 316 Mo. 1104, 295 S. W. 757, the court said: ''In impeaching a witness by use of a deposition, we declare it the proper procedure, after having the witness identify the instrument by identifying his signature, and after exhibiting to the witness the deposition, if he asks to see it, to read to the witness from the deposition a question, or questions, and answer, or answers, and ask him if he did not so testify; and such procedure may be repeated. This permits the witness to explain the answer, if desired. Then the impeaching party must offer and read in evidence all the detail matter about which he interrogated the witness. Following this, the other party may examine the witness to rehabilitate his testimony, if he deems it necessary or desires so to do, and may offer the whole deposition or such portions as desired if not otherwise irrelevant or incompetent.''

There is no merit in defendant's assignment based upon the action of the court relative to the deposition.

Defendant assigns error on plaintiff's instructions 1 and 2. After submitting a finding as to the time and place of plaintiff's injury, and a finding as to whether plaintiff and defendant were engaged in interstate commerce, Instruction No. 1 directed a verdict for plaintiff if the jury found: ''That when said locomotive engine and tender reached a point in Oklahoma between Okmulgee and Muskogee, a short distance east of and near Mowery, the track of defendant over which same was then and there engaged in passing was insecure and insufficiently supported and was rough and out of repair and dangerous and not reasonably safe for the ordinary passing of such train thereover, if you so find, and that by reason thereof same was dangerous and would cause such engine and tender so passing over same to suddenly and violently dip and make unusual lurches and unusual movements and was reasonably likely to cause injury to the fireman

thereof while performing his customary duties, if you so find, and that defendant knew or by using ordinary care could have known all the above facts, if you so find them to be the facts, before plaintiff was injured, if so, and long enough prior thereto by the use of ordinary care to have remedied said dangers and conditions, if any, before his said injury, if any, and that defendant failed to use ordinary care so to do and was thereby negligent, if you so find, and that under all the circumstances and conditions shown in evidence defendant then and there ran said engine and tender over said dangerous track, if you so find it was dangerous, at an excessive and negligent speed, if so, and that while plaintiff was then and there standing and performing his duties as such fireman, if so, said engine violently dipped down and made an unusual surge and unusual movements, if so, and plaintiff was thereby dislodged and thrown from his position and thereby injured, if so, and that his injuries resulted as a whole or in part directly from the aforesaid negligence (if there was negligence) on the part of defendant, if you so find, and that plaintiff did not assume the risk of being injured at said time, if so, as explained in other instructions, then your verdict must be for plaintiff Ben Harrison and against defendant.''

Counsel state their contention regarding Instruction No. 1 as follows: ''Plaintiff in the case at bar relied upon a speed of 30 miles an hour as negligence. The most favorable proof predicated negligence upon a speed in excess of 20 or 25 miles an hour. All of his evidence assumed that 20 or 25 miles an hour was not negligence, and there was no evidence that it was. The plaintiff testified that the actual speed was 30. Defendant's employees testified that the actual speed was 20 or 25. Under this evidence plaintiff was not entitled to recover as for negligent speed if the jury should find that the actual speed was 20 or 25 miles an hour. He was not entitled to recover unless he proved that the speed was 30 or from 25 to 30, unless the jury found that 30 miles an hour or 25 to 30 was negligence. It follows that the instruction by submitting the speed generally, to-wit, excessive and negligent as under the conditions and circumstances, was erroneous under the evidence.''

In the petition plaintiff alleged: ''That defendant was further negligent in that it caused and permitted said engine upon which this plaintiff was riding and the tender and cars attached thereto to run over such rough, unsafe, uneven and dangerous track at a high, dangerous, unsafe, unusual and reckless rate of speed under all the conditions and circumstances then and there existing.'' The petition discloses that plaintiff did not rely upon any particular speed. His evidence was that at the time he was injured the train was running about thirty miles an hour, but that did not require him to submit any particular speed to the jury. The question for the jury

was whether the speed, disclosed by the evidence, was, under the conditions, excessive and negligent. Defendant, as appears, supra, says that all of plaintiff's evidence "assumed that 20 to 25 miles an hour was not negligence." We hardly think that such is a fair inference. The negligence based on the condition of the track and on speed were submitted in the conjunctive, but we are not persuaded, as defendant urges, that because of this a particular speed should have been submitted. Defendant calls our attention to Brainard v. Mo. Pac. Railroad Co., 319 Mo. 890, 5 S. W. (2d) 15. In that case an instruction was held erroneous because it omitted to require a finding as to a fact upon which plaintiff, in part, based his case. We do not believe that plaintiff's Instruction No. 1, in the present case was erroneous, and so rule.

 Plaintiff's Instruction No. 2 is challenged on the alleged ground that it "excluded from consideration of the jury plaintiff's assumption of risks and dangers ordinarily incident to his employment." After directing that assumption of risk was an affirmative defense, Instruction No. 2 went on to tell the jury *what risks* plaintiff assumed, that is, "only such risks as were open and obvious" and such as were known and appreciated or would have been by the exercise of ordinary care, and then told the jury the character of risks plaintiff did not assume. Defendant's given instructions D-2, D-3 and D-9 clearly directed on the subject of assumed risk, and when the instructions are read together, there is no ground to support defendant's complaint as to plaintiff's Instruction No. 2.

 On argument: It is urged that error was committed in overruling objection to argument by plaintiff's counsel concerning Dr. Twyman. In the opening argument, Mr. Popham said: "Also, the record shows that this young man was examined by Dr. Twyman, and I asked their Dr. Virden when he was on the stand about their Dr. Twyman, and he was employed by the railroad."—Objection was made as follows: "MR. CONRAD: I object to this on the ground that there is no such testimony here and it is improper; I ask the court to admonish counsel. THE COURT: Overruled." Exception was saved. The point is that the record does not show that Dr. Twyman was employed by defendant. It will be noted that all that defendant asked the court to do about the argument was to admonish counsel. The court did not do this, but instead overruled the objection. Argument for both sides appears in full in the record, and it appears that counsel making the argument did not pursue the subject further after the objection. Also, it is not entirely clear that counsel intended to convey the impression that Dr. Twyman was employed by defendant. We do not think that such a deviation from the record, if counsel did so intend, in the situation, is of such import as to be of consequence.

■ It is next contended that error was committed by counsel for plaintiff in argument concerning Dr. Woolsey. The record shows: "By Mr. Popham: And they had Dr. Woolsey down at St. Louis examine this man. Dr. Woolsey was over this young doctor, and this young doctor under Dr. Woolsey had been there one month, and they used this young doctor's deposition and they didn't use Dr. Woolsey's and they didn't—Mr. Conrad: I object to that, any testimony here was available to either side; I object to it as improper and ask the court to admonish counsel as it is improper." The court did not rule. Then the record shows the following: "Mr. Popham: Here is what I am saying, I am saying that this testimony shows that you hired Woolsey and he is in charge of this hospital and you didn't bring him here; he remained silent, and there couldn't have been anything more deliberate on the part of brilliant lawyers than keeping him silent and not bringing him here to the jury—Mr. Conrad: I renew my objection to the court, that the argument is improper, and any testimony here was available to either side. The Court: Sustain the last objection. Mr. Popham: The evidence shows he was in charge of their hospital; the evidence shows he wasn't put on, doesn't it? You gentlemen were not born yesterday. And they used a doctor here that had been there in the hospital one month, in a specialty."

As appears, the court sustained the objection, but did not admonish counsel. It also appears that notwithstanding that the court sustained the objection, counsel proceeded to comment and added the additional comment that "you gentlemen were not born yesterday," but defendant made no further objection or request concerning the matter. Also, there is this further situation. Plaintiff was in the Frisco Hospital at St. Louis and was examined and treated by Dr. Woolsey. The inference is clear that Dr. Woolsey was in the employ of the Frisco Hospital, and in a sense in the employ of defendant. The situation here is similar (except Dr. Woolsey's deposition was on file) to that in Gabelman v. Bolt, 336 Mo. 539, 80 S. W. (2d) 171. Plaintiff in that case was asked if he had been requested by the attorney for the defendant to go to a certain physician for the purpose of being examined as to the extent of his injuries. He stated that he had been so requested and had been examined by the physician. The physician was not called as a witness by the defendant and this failure was made the subject of comment in argument by counsel for plaintiff. In that case, as here, error was assigned on an excessive verdict. The court, in ruling the point in the Gabelman case, said that "if Dr. Kuhn had found, through an examination of respondent that his injuries were not as serious as respondent's evidence tended to prove, it can be reasonably presumed that Dr. Kuhn would have been called as a witness." We are not persuaded that the comment on the failure to use the deposition of Dr. Woolsey was error.

On excessive verdict: As stated, the verdict was for $40,000. At the time of injury (May 14, 1930) plaintiff was thirty-nine years old. He testified that the "job (fireman) paid about $180 per month," but he perhaps was receiving, at the time, much less because he was on the "extraboard" and did not work regularly. Defendant's evidence showed that plaintiff's income for the year prior to the injury was around $900. Plaintiff's condition as given by him is substantially as follows: Prior to his injury he was physically strong and vigorous, weighed 175 to 180 pounds. After the injury he had not been able to do any work up to the time of the trial (January 15, 1934), and at the time of the trial his weight was 141 pounds. He said that he suffered constant pain in his back from the date of the injury; that he could sleep only about three hours out of the twenty-four; that he had a numbing sensation in his entire left side and that frequently when he got up he could not stand; that he was weak generally and did not have much grip in the left hand and no feeling or much strength in it, and that the same was true of his left leg: that his kidneys were out of condition, and frequent action occurred day and night; that he was not able to have bowel action except by use of strong purgatives; that he was nervous, unsteady and unable to maintain natural balance. In stepping over a fence on one occasion "my feet would not hold me up and I fell backwards into that fence." He says he fell on other occasions when his left leg gave way; that he was stung on the left hand by wasps, but felt no pain; that he has used a cane most all the time to walk; that he was naturally left handed and finds it difficult and awkard in using the right hand for purposes which before injury he used the left. Plaintiff was in the hospital at Muskogee for a short time, about two weeks, where an electric hotpad was applied to the back. After leaving the hospital at Muskogee, plaintiff was taken to the Frisco Hospital in St. Louis and was there about three weeks where he continued to receive the hotpad treatment. He went home (Tulsa) from the hospital in St. Louis. At the time of the trial plaintiff was living with his family on a farm near St. Paul, in northwest Arkansas.

Plaintiff used three physicians as witnesses, Drs. Edward Miers, Frank B. Wallace and B. Landis Elliott, all of Kansas City. We give a summary of what these physicians testified:

Dr. Miers: That he had been practicing twenty-four years; that he examined plaintiff in January, 1931, and had seen him on occasions since; that plaintiff, when examined, had lost considerable weight; blood pressure normal, heart action feeble, pulse abnormal; "marked loss of muscle coordination or muscular weakness;" trembling condition of muscles when standing; "a distinct lesion in the fourth lumbar vertebra with a displacement;" loss of sensation over the left side; obstinate constipation; frequent urination; definite Romberg

(unable to stand with eyes closed); loss of power of left hand, unable to clench left hand; headaches; inability to sleep. (Much of this, history.) Dr. Miers made the examination from observation and determined as to the vertebra by feeling. He made no X-ray and examined none. To an hypothetical question detailing briefly the activities of plaintiff before injury, the incidents of his fall, suffering, etc., Dr. Miers was asked, if the fall, in his opinion, "produced the very condition you find?" and answered, "It can, yes." Again, a longer and more detailed hypothesis was submitted and the question asked, if, in his opinion, plaintiff's infirmities were "reasonably attributable to that violence?" and the answer was, "I think they are." He also testified that plaintiff's injury was permanent.

Dr. Wallace: That he graduated from medical college in 1917; that he examined plaintiff in early part of 1931; that plaintiff had lost several pounds in weight; complained of numbness and weakness on left side and of pain in back; unstable gait, difficulty in walking and bending from side to side; that the Romberg test was positive; that he examined plaintiff within a day or two of the trial and found about the same condition; found no improvement. To an hypothetical question, Dr. Wallace stated that "it is a matter of opinion again and knowing that it (plaintiff's condition) has persisted for this period of time without any improvement, it would be reasonable to suppose that this condition might require several years to become better, if at all."

Dr. Elliott: That he had been practicing about fifteen years; that he examined plaintiff in February, 1931; that plaintiff gave him a history of his troubles and told how he suffered, etc. On examination, Dr. Elliott found blood pressure normal; pulse rapid; difficulty in maintaining his equilibrium; difficulty in walking; "he walks awkwardly and with some uncertainty; sensation in left side impaired; that "this condition may continue during his whole life, it is possible that after a time he may get better, too. Dr. Elliott also examined plaintiff just prior to the trial and found no improvement.

Defendant, on the question of plaintiff's injuries, used in person, Dr. C. E. Virden of St. Louis, and the depositions of Drs. W. L. Macon, St. Louis, and Dr. E. M. Fessenden, Springfield, Missouri. We give a summary.

Dr. Virden: That he was associated in the X-ray work of three named hospitals, and had been so engaged since 1922; that in addition to work in the hospitals he did much other X-ray work, had two laboratories down town; that his work is confined exclusively to X-rays; that he X-rayed plaintiff November 14, 1931; that he X-rayed the skull, the lungs, heart, the lumbar spine, lower dorsal spine and the pelvis; that plaintiff complained of backache, headache, constipation, but said he had "no trouble with his kidneys up until a month

ago;'' told about the occasion causing the injury; that the X-ray disclosed no skull fracture and no injury to the spine or pelvis; that the fourth lumbar vertebra showed no indication of displacement and no abnormalty.

Dr. Macon: That he graduated from medical college in 1929; was connected with Frisco Hospital in St. Louis; that he examined plaintiff at this hospital May 29, 1930; that he took history of the case; that plaintiff complained only of soreness and pain in lower back; that X-rays were taken and covered the back; that the X-rays were negative as to ''any injury to the bone;'' that plaintiff was treated by applying electric hotpad to back; that plaintiff left the hospital June 14, 1930, and had ''markedly improved;'' much less soreness in the back.

Dr. Fessenden: That he was a surgeon, been practicing since 1915; that he was connected with the Frisco Hospital in Springfield; that he examined plaintiff about July 13, 1930; that plaintiff told him all about how his legs acted, pain in back, etc., but made no complaint about his head; that plaintiff was stripped and examined; that there were no bruises, scars or external evidence of injury to back; ''I found practically nothing wrong with the back excepting that he seemed to be rather deliberate in his motions and complained more of weakness than anything else in the back at the time I examined him;'' that these symptoms were subjective; that he found no evidence of general weakness; ''there is nothing objectively to determine any particular weakness, such as emaciation or any appearance of any great loss of weight, or anything like that; but more in his manner or demeanor, that would give you the impression, that would lead to these complaints, the way he handled himself, the way he acted in general;'' that plaintiff's muscular condition was apparently normal; that nothing abnormal was found as to the nerves; no disturbance of sensation in the right leg; in the upper extremities found slight difference in grip of the right hand, ''but sensation and reflexes were all normal;'' walked with a peculiar gait; seemed to be ''a little bit afraid of himself;'' measurements of arms and legs same on both sides; no atrophy of muscles of arms (but had no record of that) ; found no evidence of paralysis; no evidence of loss of memory; ''the only thing I noted under mental condition was he seemed to be very much worried about his general condition;'' ''I asked him to flex the foot at right angles to the leg, he apparently had some difficulty in bringing the foot up and there was a marked tremor of the foot when he made this effort. That was the only objective evidence of any weakness, or what you might—I wouldn't term it a paralysis, a slight loss of motion there.'' Dr. Fessenden stated that he found nothing physically wrong with plaintiff. ''Q. To what do you attribute, if you can attribute, his present complaints, or his complaints at that time? A. My conclusion at the time of the examina-

tion, and having seen him just the once until to date, was that his whole symptoms complained of would have to be based upon a functional thing; that is, I mean by that apparently organically there was nothing wrong. Q. Do you mean by that, it was mental? A. You might state it that way. A mental state such as a man gets into following a severe accident, and that these symptoms are more mental than they are due to any organic disease or any organic lesion.''

On cross-examination plaintiff said that his home was on the side of a hill or mountain and about two miles from St. Paul; that ''once in a while'' he walked to St. Paul and back; that the hillside is not so steep that ''a horse can't make it;'' that sometimes he made this walk ''once a week.'' Combs is a town about three miles from plaintiff's home and he says that he has walked to Combs, but does not say how often.

It is not claimed that plaintiff is malingering, but disclaimer in that respect is made. However, it is stated (based on the evidence of Dr. Elliott) in the brief of counsel, that persons disclosing symptoms of nervous disorder are divided into three classes: (1) Those where there is objective evidence of physical injury resulting in nervous disorder; (2) those where there is no objective, ocular evidence of injury aside from physical manifestations where the person is perfectly honest as to the nervous condition; and (3) malingering. And it is suggested that plaintiff is in the second class. The assignment on excessive verdict is always troublesome where there is merit to the assignment. No rule has been, or can be, devised to definitely guide. All such assignments must depend upon the particular facts. Comparison with other cases is not always satisfactory. Evidence of injuries in Colwell v. St. Louis-S. F. Ry. Co., 335 Mo. 494, 73 S. W. (2d) 222, was similar to that here, except as to the bowel and kidney trouble, and there were injuries shown in the Colwell case not shown here. In that case the injured party was thirty years old and at the time of his injury was earning $200 per month. Verdict in that case was for $33,000. The trial court required a *remittitur* of $13,000 and a further *remittitur* of $8000 was directed by this court, leaving the final amount at $12,000. In Cole v. Uhlmann Grain Co., 340 Mo. —, 100 S. W. (2d) 311, handed down concurrently herewith the subject of excessive verdict is considered more extensively than here. We make reference to that case for further reasoning on this subject. Able counsel for both sides here call our attention to a number of cases. We do not deem it necessary to review these cases. We think the verdict in the present cause is excessive by $25,000.

If plaintiff will, within ten days from the filing of this opinion, file here a *remittitur* of $25,000, the judgment for $15,000 will be affirmed,

otherwise the judgment will be reversed and the cause remanded. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.