**KANSAS CITY AREA TRANSPORTA-TION AUTHORITY, Respondent,**

v.

**4550 MAIN ASSOCIATES, INC., et al., Appellants.**

**No. WD 37398.**

Missouri Court of Appeals,
Western District.

Nov. 12, 1986.

As Modified Feb. 3, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 3, 1987.

Application for Transfer Sustained March 17, 1987.

Case Retransferred Sept. 4, 1987.

Court of Appeals Opinion Readopted Sept. 30, 1987.
Certiorari Denied Feb. 22, 1988.
See 108 S.Ct. 1020.

W. Stephen Nixon, Independence, for appellants.

James G. Lindquist, Kansas City, for respondent.

Before CLARK, C.J., and NUGENT and GAITAN, JJ.

CLARK, Chief Judge.

This appeal by 4550 Main Associates is from a judgment entered on a jury verdict finding the Kansas City Area Transportation Authority (ATA), to be the owner of a railroad right-of-way along an eight mile corridor, one segment of which crosses appellant's land. The judgment also operated to eject appellant from the property and to enjoin future trespass. The disposition mooted appellant's counterclaims for rents and incidental relief. This appeal followed.

The right-of-way easement here in controversy has spawned extensive litigation and generated in this case 800 pages of trial transcript. Appellant presents fifteen points of error and the parties have filed 195 pages of briefs and argument. The pivotal issue, however, is readily identified as turning on the question of whether the claimed right-of-way has in fact been abandoned for railroad use and thus lost to those claiming the easement. Four of appellant's points deal with this question and urge that appellant was entitled to a directed verdict because abandonment in fact had been established and ATA was estopped to claim otherwise. The contention is dispositive of the case, but must be preceded by a recitation of some background detail.

## HISTORY OF THE COUNTRY CLUB RIGHT–OF–WAY

Records of deeds and other documents introduced in evidence show the right-of-way in issue to have originated in 1873 by a conveyance to the Kansas City, Memphis and Mobile Railroad Company. The property was described as a strip of land fifty feet on each side of the center line of a railroad "as the same is or may be located." In 1926, the right-of-way was acquired by the Kansas City Public Service Company and later by Kansas City Transit, both being municipally franchised street car and bus companies providing local passenger service.

In 1962, when use of street cars had ended in Kansas City, thereby making a rail line surplus to the municipal transit company, the right-of-way was sold and assigned to parties named Ashley. During the six years which followed, the Ashleys continued a rail freight operation, previously offered by the municipal transit company as an adjunct to its passenger service. The freight service moved rail cars to and from mercantile businesses along the route providing connections to other carriers at either end of the route. The freight service provided by the Ashleys ended in 1968 and was never resumed. No rail traffic along the route has moved since that date and no customer demand for the service has existed.

The subject right-of-way is frequently referred to as the Country Club line. This name stems from the route designation of the street car service which formerly used the track in municipal transit service. Under Ashley ownership of the right-of-way, the freight transport business was referred to as the Kansas City Public Service Freight Operation, apparently a partnership. That entity held a certificate from the Interstate Commerce Commission as an interstate common carrier and served customers along the right-of-way by delivering and picking up freight which was interchanged with other rail carriers coming from or destined to shippers throughout the country. When the Ashleys ended rail service in 1968, they gave notice to the Interstate Commerce Commission that service on the line was "embargoed." Such notice indicates that the certificated carrier will no longer accept freight for delivery along the embargoed route. Customarily, an embargo indicates a temporary suspension of service attributable to conditions beyond the carrier's control.

The Country Club railroad line continued under embargo status from 1968 until 1981 when the ICC issued its certificate of abandonment. During the period of embargo, the Ashleys paved over areas of the right-of-way for use as automobile parking lots and leased locations where advertising billboards were erected.

The ATA is a bistate transit authority which operates buses in the greater Kansas City vicinity. It has long had the objective of acquiring the Country Club line for future development of mass transit. In 1970, after attempts to negotiate a purchase of the right-of-way from the Ashleys had failed, the ATA brought proceedings to take the property by condemnation. A jury awarded compensation to the Ashleys, the money was paid and the ATA took possession, but on appeal, the Missouri Supreme Court ruled that a right-of-way held under certification of an interstate common carrier by the Interstate Commerce Commission was under the exclusive jurisdiction of the Commission and could not be condemned under state law. *Kansas City Area Transportation Authority v. Ashley*, 555 S.W.2d 9, 10 (Mo. banc 1977). The property was thereby restored to the Ashleys under their claim to ownership of the easement.

Despite the absence of any use of the right-of-way for railroad purposes since 1968, the certificate of public convenience and necessity issued to the Ashleys by the ICC remained in effect after 1968 continuing jurisdiction over the route in the Commission, as the Supreme Court opinion cited above recognized. To remove this impediment to condemnation, the ATA instituted proceedings before the Commission in 1980 to decertify the route. These proceedings before the Interstate Commerce Commission will be described below in detail. It suffices for this summary to say that a finding of abandonment in fact was made by the Commission sustaining the ATA contention that the Ashleys had neither the capability nor intent to resume rail service along the route of the right-of-way easement.

As a final development in history of the Country Club right-of-way, on October 27, 1981, the Ashleys agreed with the ATA upon terms of sale and sold to the ATA their interest in the right-of-way. The claim which the ATA asserts in this suit is based on that transaction.

## NATURE OF PROPERTY RIGHT AT ISSUE

Before proceeding to a discussion of the issues presented to the trial court, it is necessary to define the interest in real estate represented by the Country Club right-of-way.

As was noted in the previous section of this opinion, the first record of ownership in the right-of-way appears in a deed from Wyatt and Mary Webb to Kansas City, Memphis and Mobile Railroad Company. The deed recited a valuable consideration and contained no restrictions on the use of the property or limitation on the quantum of title transferred. It may therefore be assumed that the grantee acquired a fee simple estate, *Nigro v. Ashley*, 690 S.W.2d 410, 417 (Mo.App.1984), if the description of where the railroad was situated could be supplied. The Kansas City, Memphis and Mobile Railroad did not, however, survive. It entered bankruptcy and on a sale of the assets by the bankruptcy trustee, the interest in the right-of-way was conveyed to James I. Brooks on December 15, 1879.

It is not shown in this record whether the Kansas City, Memphis and Mobile Railroad was ever built or what use, if any, was made of the right-of-way by the grantee, Brooks. Moreover, the chain of title ends with the conveyance to Brooks. No deed from Brooks appears and there is no record in Jackson County of any administration on his estate. There is no title record on the property for the next twenty-two years.

On October 4, 1901, parties named William and Alice Reid, who were then strangers to the record title, executed a quit-claim deed to the right-of-way in favor of E.E. Rankin who then conveyed on the following day to Winner Real Estate Company, that by warranty deed. In 1907, Winner Real Estate conveyed to the Kansas City and Westport Belt Railway Company but, as evidenced by the record of proceedings in the United States District Court, that railroad suffered judicial foreclosure and the right-of-way was sold by a trustee to the Kansas City Railways Company, a prede-

cessor to the Kansas City Public Service Co.

■ Although the ATA and their grantors, the Ashleys, trace an unbroken chain of title to William and Alice Reid, grantors in the earliest recorded deed subsequent to the conveyance to James I. Brooks in 1879, there has been no showing of any title in the Reids and therefore the conveyances which depended on the Reids' ownership could not have transferred title. No valid alternate basis has been proposed to support a claim that the Reids owned any estate in the right-of-way [1] and no evidence was presented to support any contention that the Reids had acquired title under any hypothesis.

Throughout the period commencing with acquisition of the right-of-way by the Kansas City Railways Company in 1916, it appears that the right-of-way was continuously used for transport of passengers or freight or both by rail until the Ashley embargo in 1968. That usage was obviously sufficient to create an easement by prescription, but by the very nature of the use for railroad purposes, the parties in interest are precluded from claiming acquisition of fee title by adverse possession. Indeed, no such claim is or has been made here by the ATA.

In light of the foregoing, the subsequent discussion in this opinion will proceed on the premise that the property interest owned by the Ashleys was an easement for a railroad right-of-way acquired by prescription and not a fee estate in the land.

## ISSUES PRESENTED BY THE PLEADINGS, SUBMISSION AND JUDGMENT

Appellant is the owner of certain real estate improved with commercial structures located on the west side of Main Street in Kansas City. The Country Club right-of-way runs in a diagonal direction along the west or rear of appellant's land. According to the ATA petition filed in this case, appellant has been occupying that portion of the claimed right-of-way bounded by a projection of appellant's side property lines in a westerly direction and has built structures on the right-of-way and has used the ground for automobile parking and ingress to and egress from the rear of appellant's building. The petition sought a judgment that appellant be ejected from the right-of-way and that ATA be declared the owner.

By its answers, appellant generally denied ATA's claims of ownership and affirmatively alleged that the easement formerly burdening its fee interest had terminated by abandonment. Appellant also asserted counterclaims which asked for an accounting for rents and profits derived by ATA and for damages.

The submission to the jury was upon instructions which required a finding in favor of ATA unless the jury believed appellant had proved its claim of abandonment. Consideration of appellant's claim for damages was, of course, conditioned on proof of abandonment. The jury found in favor of ATA and the court entered judgment which also described the railroad right-of-way and ATA's ownership of the easement.

## THE ICC PROCEEDINGS

■ ATA compiled for purposes of this suit a record of the ICC proceedings designated plaintiff's exhibits 17 and 18. The parties stipulated at trial to the authenticity of the exhibits. One of the issues on this appeal is the ruling of the trial court which precluded appellant from reading portions of this record to the jury. Admission of exhibits 17 and 18 into evidence in their entirety is not an issue on this appeal because we judicially notice this stipulated record. This we do because, unlike decisions of state administrative agencies, the

---

1. The ATA does argue that because the deed from Winner Real Estate announced Winner to be the owner of an estate in fee, title was thereby shown under the "ancient documents" rule. That rule is one of evidence which sanctions the proof of facts by documents otherwise not admissible to prove the statements because amounting to hearsay. The estate in real estate is not a fact to be proved by a deed recitation. Moreover, the issue here is not the title held by Winner, but that owned by the Reids.

orders, regulations and decisions of the Interstate Commerce Commission, and other federal regulatory agencies, are made pursuant to federal statutes and have the force of law. *Hiatt v. Wabash Ry.*, 334 Mo. 895, 69 S.W.2d 627, 630 (1933); *Insurance Co. of the State of Pennsylvania v. West Plains Air, Inc.*, 637 S.W.2d 444, 446 (Mo.App.1982).

The Interstate Commerce Commission records contained in plaintiff's exhibits 17 and 18 reveal the following: Proceedings applicable to the entire Country Club certificated route and the abandonment of service were initiated by an application filed by ATA on October 13, 1980. The filing was entitled "Application For Certificate Of Public Convenience And Necessity Permitting Abandonment Of Railroad." Among the allegations in the application, verified on oath of the ATA's agent, the application set out:

"(1) The present physical condition of the Country Club Right-of-way is such that it is totally unusable for railroad operations. It has been fenced off, leased out for parking purposes, paved over and generally allowed to fall into a state of disrepair that would not permit railroad traffic.

(2) Applicant states that even if the necessary rehabilitation is performed, the line could not be operated properly since there are no longer any customers for rail service on this line."

The application sought approval by the ICC of the abandonment of the trackage and right-of-way as a certificated common carrier route, thereby removing that obstacle to condemnation of the Ashleys' interest. The Ashleys opposed the application thus framing an adversarial contest over the issue of whether past non-use of the right-of-way and the absence of any prospect for reinstitution of service warranted a declaration of abandonment.

The decision on the application by ATA for abandonment of the Country Club right-of-way was rendered by the ICC on August 19, 1981 and a certificate and decision in amended form were issued September 11, 1981 and served September 28,

1981. The decision sustained the applications for abandonment and recited the following findings of fact material to this case:

"The record leaves no doubt that a *de facto* abandonment of the Freight Operation line has taken place. No rail service or recognizable rail track maintenance has taken place since September of 1968. Nor has there been any serious effort on the part of Freight Operation to solicit traffic or reinstate rail service. Indeed, the current use of the rail line for parking lot and billboard purposes is totally unrelated to the carrier's obligation to perform rail service." (Emphasis in original).

The decision also stated:

"Although it is true that the grant of an abandonment application is permissive and the railroad can choose not to surrender its common carrier status and obligations, a certificate of abandonment is evidence in any court proceeding that the line is not required by the public for rail operations. AB–71 (sub-No. 1), *Anne Arundel County and the City of Annapolis—Abandonment over the Baltimore and Annapolis Railroad Company from Glen Burnie to the City of Annapolis* (not printed), decided February 27, 1980."

The Ashleys filed a petition for administrative review of the August 19, 1981 decision pursuant to 49 C.F.R. § 1100.98(c)(1) contending, among other points, that the Commission had erred in its finding of de facto abandonment. The Ashleys argued that they had no intent to abandon but had always evidenced the purpose of preserving the line for future use. The ATA presented suggestions opposing the petition for review and argued the Ashleys' contention that they had no intention to abandon was "whimsical." The Commission denied the application for administrative review.

The next event occurred, as noted above, when ATA and the Ashleys agreed October 27, 1981 on a sale of the right-of-way. ATA sought at the same time to withdraw its previous application for abandonment

filed with the ICC and to strike the August 19 and September 28 decisions. As the ATA motions announced, the ATA was concerned that the abandonment certificate issued by the ICC could be used by private parties as a basis for arguing that cessation of rail operations by the carrier, the Ashleys, after abandonment had been declared would terminate the right-of-way easement. The ATA request to withdraw the abandonment application and motion to strike were summarily denied by the Commission October 30, 1981.

At the final proceedings before the ICC recorded in the exhibits, the ATA and the Ashleys filed a joint petition December 22, 1981 requesting that the case be reopened for the purpose of imposing a 90 day expiration date on the certificate of abandonment. The effect of such a modification in the decision would be to expunge the certificate if the carrier did not exercise the option to abandon within the stated period. Among the reasons offered by ATA and the Ashleys for an amended decision which would cause the certificate of abandonment to expire was the concern that the ICC decision could be used by abutting property owners to contend that under state law, the right-of-way easement had terminated by abandonment. The ICC entered its decision on March 18, 1982 denying the joint petition and stated in part:

"In the face of no rail operations over the subject line in the past twelve years nor any reasonable attempt to provide rail service, it was apparent that a continuation of our (ICC) jurisdiction over the line was neither necessary nor desirable. For this reason, the abandonment authorization issued in our decision served August 21, 1981, imposed no time limitation upon the authority granted. The intent of the August 21, 1981 decision to impose no time limitation upon the abandonment authorization was properly reflected in the certificate of abandonment issued November 2, 1981.

Petitioners' concern over the potential for litigation arising out of conflicting claims to the subject right-of-way are directed at issues relating to real property rights. Such matters are not properly within the purview of this Commission but fall with the exclusive jurisdiction of the State in which the property is located."

## COLLATERAL ESTOPPEL AND THE ISSUE OF ABANDONMENT

The primary, if not exclusive, defense to the ATA petition in ejectment was appellant's claim that ATA acquired no property interest in the right-of-way because the Ashleys had abandoned the operation of a railroad prior to any assignment or attempted assignment of the easement to the ATA and that there were no easement rights to transfer. Apart from the facts evidencing abandonment, the cessation of all rail service, removal of tracks and use of the property for parking lots and billboards, appellant moved for judgment in its favor based on the doctrine of collateral estoppel resulting from the ICC proceedings. This contention was rejected by the trial court and in points presented on this appeal, appellant argues that a failure to render judgment in its favor based on estoppel was error.

Beyond question, a critical issue in the case was whether the Ashleys had abandoned the use of the Country Club right-of-way for the purposes it was established and, in consequence, whether any property rights remained which could be sold and conveyed to ATA. Appellant argued at trial and reasserts here that ATA was collaterally estopped from asserting there had not been an abandonment because ATA sought and received from the Interstate Commerce Commission a decision that abandonment had occurred.

 Collateral estoppel, also described as issue preclusion, prevents the same party from relitigating issues which have been previously adjudicated. There is no requirement of mutuality of estoppel and a stranger to the prior suit may assert collateral estoppel against a party to a prior suit to bar relitigation of issues already decided. *Oates v. Safeco Insurance Co. of America*, 583 S.W.2d 713, 719 (Mo. banc 1979). The nature of collateral estoppel is

such that a fact appropriately determined in one lawsuit is given effect in another case involving different issues. *Hudson v. Carr,* 668 S.W.2d 68, 70 (Mo. banc 1984). To invoke the doctrine of collateral estoppel, four elements must be present: (1) the issue decided in the prior litigation is identical with the issue in the present action; (2) the prior adjudication resulted in a judgment on the merits; (3) the party against whom collateral estoppel is asserted was a party or in privity with the party to the prior adjudication, and; (4) the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit. *Lewis v. Barnes Hospital,* 685 S.W.2d 591, 594 (Mo.App. 1985).

In this case and in the case before the ICC, it is apparent that elements (3) and (4) above are satisfied. ATA was the moving party before the ICC and is the party against whom the estoppel is asserted. There was a full and fair opportunity for ATA to assert its position as evidenced by the ICC decision in favor of the result ATA sought. As to element (2), an adjudication on the merits, ATA does not make any contention here that the ICC decision was not equivalent to a judgment. The proceeding was adversary in character and matured after post-decision motions to a non-appealable result. The authorities previously cited indicate that the ICC decision has the force and effect of federal law. No reason appears why, for purposes of estoppel, the decision should not be equated with a judgment on the merits. This leaves element (1), the identity of issues, which requires further discussion.

The ICC decision may be invoked for estoppel purposes only if abandonment for ICC decertification of common carriers rests on the same factual grounds and upon the same principles of law as does abandonment of a railroad right-of-way easement under Missouri property law. We look first to Missouri property law.

■ Abandonment is one of the recognized methods of terminating or extinguishing an easement and is complete when the privilege of use authorized by the easement wholly and permanently ceases. *Eureka Real Estate & Investment Co. v. Southern Real Estate & Financial Co.,* 355 Mo. 1199, 200 S.W.2d 328, 331 (1947).

■ Mere non-user of an easement will not extinguish the easement unless accompanied by an intention on the part of the owner of the dominant estate to abandon it. There must be an intention to abandon without an intention to again repossess it. *Hatton v. Kansas City, C & S Ry.,* 253 Mo. 660, 162 S.W. 227, 232 (1913). The doctrine of abandonment will in some cases operate against railroads. *St. Louis-San Francisco Ry. v. Dillard,* 328 Mo. 1154, 43 S.W.2d 1034, 1038 (1931). When a railroad ceases to use for railroad purposes property over which it has an easement, the original owners or their grantees thereafter hold the property free from the burden of the easement. *G.M. Morris Boat Co. v. Bishop,* 631 S.W.2d 84, 88 (Mo.App.1982). Some Missouri cases dealing generally with abandonment of easements refer to relinquishment of possession as a necessary element of abandonment. In the case of railroads, however, an easement for a railroad right-of-way is extinguished when the railroad ceases to run trains over the land. *Schuermann Enterprises, Inc. v. St. Louis County,* 436 S.W.2d 666, 668 (Mo. 1969). The test for abandonment of an easement under Missouri law is, therefore, non-user of the easement accompanied by conduct indicating an intention to abandon.

Federal case law announced in decisions considering abandonment in the setting of Interstate Commerce Commission certification of rail service applies a standard identical to Missouri law. In *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 313, 101 S.Ct. 1124, 1128, 67 L.Ed.2d 258 (1981), the court observes in a footnote: "An abandonment is characterized by an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line," citing *ICC v. Chicago & North Western Transportation Co.,* 533 F.2d 1025, 1028 (8th Cir.1976). Also cited is *ICC v. Chicago, Rock Island & Pacific R.R.,* 501 F.2d 908, 911 (8th Cir.1974) where it is said

that abandonment implies an intention to indefinitely or permanently cease all service and factually, determination of the question revolves around the intent of the railroad.

▪ It follows from a comparison of federal and Missouri law applicable to abandonment of a right-of-way by a railroad that the Interstate Commerce Commission, in reaching its decision that the Ashleys had abandoned the Country Club line, applied the same law as is controlling in the present case. Despite the protestations by the Ashleys that they were holding possession of the right-of-way for some future railroad use, the undisputed evidence was that no such use was realistically in prospect and the property was in fact being used for purposes totally unrelated to a railway operation. The actual conduct by the Ashleys was, and for some years had been, consistent only with an intent to cease indefinitely all use of the easement for a railroad.

The result reached by the Interstate Commerce Commission and advocated by the ATA is binding on the ATA under the doctrine of collateral estoppel. All of the elements of collateral estoppel are present. The ATA is not to be heard in this case to assert a claim diametrically opposed to that which it presented to the Interstate Commerce Commission merely because in the setting of this proceeding, its interests have changed. The record was sufficient to support a finding of abandonment in fact and the trial court was in error in failing to sustain appellant's motion for judgment on grounds of estoppel.

The ATA argues that appellant was properly denied the benefit of collateral estoppel associated with the ICC decision first, because abandonment could only mature under ICC procedure at the election of the Ashleys and not by the decision itself, and second, because on the effective date of the decision, November 2, 1981, the Ashleys could not make the election, having sold

the right-of-way to the ATA six days earlier. This argument fails to recognize the distinction between abandonment of the right-of-way in fact for purposes of the property easement and abandonment of status as an ICC certificated carrier.

▪ It is correct that an ICC certificate of abandonment is permissive in that the carrier may elect to resume service and retain certificated status or may accept the option of abandonment.[2] In this case, the Ashleys did elect to abandon by concluding the sale of all the railroad property to the ATA. Quite obviously, the Ashleys foreclosed any possibility of electing to resume service over the line as a certificated common carrier when they divested themselves of the physical properties. The sale itself was a conclusive indicia of abandonment on the part of the Ashleys. *Seventy-Ninth Street Improvement Corp. v. Ashley*, 509 S.W.2d 121, 123 (Mo.1974); *Concord Township v. United States*, 625 F.2d 1068, 1072 (3rd Cir.1980).

The associated contention that abandonment could not have occurred until November 2, 1981, the effective date of the ICC decision, would be relevant only if this case presented a question of jurisdiction as did the previous case of *Kansas City Area Transportation Authority v. Ashley, supra*. Had the ATA again undertaken to condemn the Ashleys' interest, it could well have been argued that ICC jurisdiction continued to prevent intrusion of state authority to condemn until ICC jurisdiction was finally surrendered. Here, however, the very transaction upon which the ATA relies for its claim to the easement, the sale by the Ashleys, has validity only if the Ashleys were free to dispose of the route without hindrance by the ICC.

It is significant in evaluating the ATA contention to note that the sale to the ATA made no pretense or attempt to assign the ICC route certification and ATA advances no claim to standing in its action here as an interstate carrier, nor could it. Certifica-

---

**2.** The carrier is effectively put to the choice by issuance of the certificate of abandonment. In the event the carrier does not abandon certification but also does not resume service, the ICC may, for the benefit of shippers, obtain injunctive relief compelling the carrier to provide service. *ICC v. Chicago & N.W. Transp. Co., supra.*

tion of any carrier by the ICC over the Country Club route was precluded once the Commission found there was no public need for service. Moreover, the ATA's professed intention to use the route at some future date for light rail transit involves an activity not subject to ICC regulation and therefore a certificate of public convenience and necessity is not a subject in which the ATA has any legitimate interest. In sum, the only significance of the six day period between October 27, 1981 and November 2, 1981 was the theoretical obligation of the Ashleys as certificate holders to provide freight service and a corresponding restriction on their entitlement to dispose of the route. Only the ICC or freight customers would have any standing to complain that the Ashleys had transferred their interests to ATA before the certification of abandonment was final. No such claims have been made and the ATA is in no position to do so.

## ABANDONMENT OF THE EASEMENT AS AN UNCONTESTED FACT

Apart from the bar of collateral estoppel, it also appears the evidence in the case established conclusively that the Ashleys had in fact abandoned the easement for railroad use long prior to the sale to the ATA and the issue was therefore not for decision by the jury. This contention is presented by appellant in Point V of its brief.

The facts on this subject, discussed earlier in this opinion, were not the subject of any dispute. No railroad cars or locomotives had been operated on the Country Club line for more than twelve years before the purported sale of the right-of-way to the ATA. There were no customers for rail freight service, the prior service had been discontinued indefinitely and the Ashleys had no plans to resume service. Parking lots and billboards had been installed on the right-of-way and in consequence, the continuity of the route had been interrupted so that trains could not be run. The sole sources of income from the right-of-way to the Ashleys between 1968 and 1981 were from non-railroad uses including auto-

mobile parking lot fees and billboard rentals.

The authorities previously cited, *St. Louis-San Francisco Ry. v. Dillard, supra;* and *Schuermann Enterprises, Inc. v. St. Louis County, supra*, establish that when an easement is created for a rail line, that easement terminates and the abutting property owners are freed from the burden of the easement once the holder of the easement ceases using the property for railroad purposes. Abandonment of the easement is a necessary consequence when trains no longer are operated over the land on which the easement is claimed. An intention to abandon is inferred by the discontinuance of rail service with no prospect for resumption of service.

The basis on which the Ashleys claimed to have retained the right-of-way easement, despite twelve years during which no rail operations were conducted, was an indefinite prospect that the right-of-way could be used at some uncertain future date for mass rail transit. James G. Ashley, Jr. in his own testimony acknowledged he had no capability to establish such a service, that mass rail transit had not been a feasible use of the property between 1968 and 1981, that it was not a practical project as of the date of trial and might never be.

The evidence in this case, summarized above, established conclusively that the Ashleys had abandoned the right-of-way for railroad uses, despite their continued possession and use of the property for rental income, and the trial court therefore erred in submitting the issue of abandonment to the jury.

## UNRESOLVED ISSUES

The conclusion that the right-of-way easement had been lost by abandonment and did not constitute a property interest in real estate which could be transferred to the ATA by the Ashleys necessitates reversal of the trial court judgment, but does not conclude the case. As was noted earlier, appellant asserted counterclaims against the ATA based on the contention that use of the segment of the purported

easement abutting appellant's unburdened fee was wrongful and ATA should account for any rents and profits derived therefrom. Reversal of the judgment in favor of the ATA on its claim to the easement necessarily revives the counterclaims.

Appellant's counterclaims were pleaded in four counts, accounting, conversion, conspiracy and constructive trust, the conversion count being based on an allegation of a confederation between ATA and the Ashleys in designing the sale contract of October 27, 1981. The conversion count was distinguishable only in its prayer for punitive damages. At the close of appellant's evidence, the court sustained a motion to dismiss the conspiracy count and also sustained a motion for judgment in favor of ATA on appellant's claim for punitive damages. The submission, as best the trial record can be construed without a formal judgment entry on the counterclaims, was for a recovery of appellant's actual damages based either on an accounting or on conversion.

■ Appellant is entitled to an assessment of damages by a jury on one or more of the theories pleaded, although the counterclaim also presents some claims of an equitable nature tryable to the court. The case must therefore be remanded for disposition of the counterclaims in present or amended form consistent with the relief appellant may ultimately choose.

The judgment in favor of Kansas City Area Transportation Authority on its petition for ejectment and declaration of ownership in the right-of-way is reversed and the case is remanded for trial of the counterclaims by 4550 Main Associates, Inc.

All concur.