Maurice L. & Delores J. GLOSEMEYER, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Dorothy M. Moore, et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The United States of America, Defendant.

The Town of Grantwood Village, Plaintiff,

v.

The United States of America, Defendant.

No. 93–126L, 93–134L, 98–176L.

United States Court of Federal Claims.

Jan. 14, 2000.

William J. Travis, St. Louis, Missouri, argued for plaintiffs. With him on the briefs were Norman W. Pressman and Stephen R. Clark, St. Louis, MO.

Mark F. Hearne, II, St. Louis, Missouri, argued for plaintiff Grantwood Village. With him on the briefs was Robin C. Trueworthy, St. Louis, MO.

William Perry Pendley, Mountain States Legal Foundation, Denver, CO, argued for plaintiffs Maurice and Delores Glosemeyer. With him on the briefs was Adam T. Reeves, Mountain States Legal Foundation, Denver, CO.

Lisa A. Holden and Thomas L. Halkowski, U.S. Department of Justice, Environmental & Natural Resources Division, General Litigation Section, Washington, D.C., argued for defendant. With them on the briefs was Lois Schiffer, Assistant Attorney General, U.S. Dept. of Justice, Washington, D.C.

Kathleen L. Jennings, Washington, D.C., argued for Amicus Curiae Rails–to–Trails Conservancy. With her on the briefs was Andrea C. Ferster, Washington, D.C.

## OPINION

BRUGGINK, Judge.

The plaintiffs in these cases are Missouri landowners who claim to own the fee interests in lands underlying two railroad lines. Their Fifth Amendment takings claims have been consolidated for the purpose of resolving common issues of federal and Missouri law. The primary question presented is one of state law—whether "railbanking," the preservation of otherwise abandoned railroad easements for possible future railroad activity by interposition of interim trail use, constitutes a railroad purpose under Missouri law. Railbanking was imposed by Congress through the National Trails System Act

Amendments of 1983 (Rails–to–Trails Act).[1] Pending are cross motions for summary judgment as to liability. After extensive written and oral argument, the court holds, for reasons explained below, that railbanking does not constitute a railroad purpose under Missouri law and that the imposition of involuntary interim trail use constitutes a taking of a new easement in plaintiffs' land.

## BACKGROUND

■ Plaintiffs allege that they own fee interests in lands burdened by railroad easements. For purposes of ruling on the motions for summary judgment, those interests are assumed. Missouri law as to the respective rights of the underlying fee estate and the railroad user will be explored in more detail below. It is sufficient at the outset to state that plaintiffs' lands were subject to easements for railroad purposes. As a matter of Missouri law, once such an easement is extinguished, by abandonment or otherwise, the right to control of the surface reverts to the underlying fee owner.

Although the respective property interests are subject to state law, railroads operate subject to federal regulation. In order for a railroad to cease operations in an area or abandon its track over a particular section of railroad, it must obtain permission from the appropriate federal government agency. See 49 U.S.C. § 10903 (1996). Currently, this is the Surface Transportation Board (STB); however, at all times relevant to this action, the appropriate agency was the Interstate Commerce Commission (ICC).[2] The means by which railroads obtain such permission

was altered by the Rails–to–Trails Act. The railroad must file a Notice of Intent to file an application to abandon or discontinue service and, within a short time period after the filing of the Notice of Intent, must file the application to abandon or discontinue rail service. See 49 C.F.R. §§ 1152.20, 1152.22. In the case of a railroad that is applying for abandonment under 49 C.F.R. § 1152.50, the railroad files a Notice of Exemption instead of a Notice of Intent.[3] The application to abandon/discontinue will be approved by the STB if the "present or future public convenience and necessity require or permit abandonment or discontinuance." 49 C.F.R. § 1152.28(a)(1).

Assuming that the application is approved, then a qualified trail provider [4] may request permission to use the affected right-of-way as a recreational trail. See 49 C.F.R. § 1152.29(a). At that point the STB may issue either a "Certificate of Interim Trail Use or Abandonment" (CITU) or, in the case of a proceeding involving the exemption of a route from federal regulation, a "Notice of Interim Trail Use or Abandonment" (NITU). See 49 C.F.R. § 1152.29. When the STB issues a CITU or NITU the railroad can discontinue operations, remove track, and take any other measures consistent with the cessation of railroad operations. See id. The railroad has 180 days from the date of the issuance of the CITU or NITU to negotiate an agreement for interim trail use with a qualified trail provider. The STB can issue extensions of the CITU or NITU, thereby prolonging the period within which the railroad can negotiate a trail management agreement. Any agreement between the

---

1. Pub.L. 98–11, 97 Stat. 48, to the National Trails System Act, Pub.L. 90–543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. § 1241 et seq. (Supp. II 1996)).

2. Before 1995, discontinuance and abandonment of railway service were the responsibility of the Interstate Commerce Commission (ICC). These responsibilities were transferred to the STB by the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, 49 U.S.C. § 10501 (1996).

3. 49 C.F.R. § 1152.50 is a more streamlined abandonment process than that set forth in §§ 1152.20–29. In order to be eligible for an exempt abandonment pursuant to § 1152.50, no local rail traffic must have run over the line

sought to be abandoned in the two years prior to the filing of the notice of exemption. There is no material difference in the legal effect of the two abandonment processes. Both seek the same legal result: approval to abandon rail service over a particular rail line.

4. A "qualified trail provider" is a "state, political subdivision, or qualified private organization that is prepared to assume full responsibility for management of [railroad] rights-of-way and for any legal liability arising out of such transfer or such use, and for the payment of any and all taxes that may be levied or assessed against [the railroad] rights-of-way." 16 U.S.C. § 1247(d) (1999 Supp.).

railroad and a trail provider must allow the STB to reopen rail service on the line in the event the STB or a rail carrier can show that a resumption of rail service is justified. *See Chevy Chase Land Co. v. United States,* 37 Fed.Cl. 545, 554 (1997). Once an agreement is reached, the trail provider assumes responsibility for the land and is free to commence operation of a trail; the right-of-way has been put in the national "rail bank" in the event it is needed for future rail service.

If no agreement with a trail provider is reached within the time-period prescribed by the CITU/NITU and any applicable extensions, the railroad is free to discontinue rail service and abandon the right-of-way. *See* 49 C.F.R. § 1152.29(b)(1)(ii). If this occurs, the right-of-way passes out of federal jurisdiction. *See Preseault v. ICC,* 494 U.S. 1, 7, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990). Once abandoned by the railway, the railroad's right-of-way terminates and the underlying property owner would then own the parcel free and clear of the burden previously imposed by the now-extinguished easement. *G.M. Morris Boat Co., Inc. v. Bishop,* 631 S.W.2d 84 (Mo.Ct.App.1982).

*Grantwood Village*

Grantwood Village, the plaintiff in Action No. 98–176L, is a municipality located in St. Louis County, Missouri. It owns a parcel of land within its borders. Until at least 1987, and perhaps as late as 1991, the Missouri Pacific Railroad (MoPac) and its predecessors in interest possessed a right-of-way easement over this parcel and operated a rail line, known as the Carondelet Branch,[5] over it. Other than the 1100–foot section referred to below, no trains have run over that line since 1991.

On February 10, 1992, MoPac filed a Notice of Exemption pursuant to 49 C.F.R. § 1152.50 with the ICC seeking to discontinue and abandon railroad service over a 6.2–mile part of the Carondelet Branch; Grantwood Village's property was contained within this section. MoPac's Environmental Report, filed with its Notice of Exemption, stated that "there has been no local movement of freight for more than two years and overhead traffic has been successfully rerouted in the railroad's operations. Thus, there should be no effects from the proposed abandonment." The Report went on to state that there was "no feasible alternative to the abandonment and no need to preserve rail service" along the Carondelet Branch and that there was "no indication there would be future traffic sufficient to justify the costs necessary to justify the costs necessary to sustain rail operations over the line." When asked to describe its proposed action, MoPac stated, also in its Environmental Report, that "the proposed action involves discontinuance of [railroad] operations and physical abandonment of the Carondelet Branch."

On February 6, 1992, Gateway Trailnet (Trailnet), a Missouri corporation, had petitioned the ICC for a NITU applicable to the portion of railway that MoPac was seeking to abandon. Trailnet is a non-profit corporation which operates recreational trails. The ICC issued a NITU on March 25, 1992 allowing MoPac and Trailnet to negotiate an agreement for interim trail use for the affected part of rail line. After a series of extensions of the NITU, MoPac and Trailnet came to an agreement for interim trail use for the 6.2–mile stretch of land; this agreement was finalized on December 30, 1992. On that same day, MoPac executed a quitclaim deed in favor of Trailnet conveying all of its interests in the Carondelet Branch. After executing its agreement with Trailnet, MoPac removed all of the rails and ties along the line; Trailnet has since maintained and operated a recreational trail along the line. *Grantwood Village v. Missouri Pac. R.R. Co.,* 95 F.3d 654 (8th Cir.1996).

The agreement between MoPac and Trailnet allowed for the possible resumption of rail service on the 6.2–mile stretch. On April 9, 1997 Union Pacific Railroad Corporation applied to the STB to reopen an 1100–foot portion of the Carondelet Branch previously abandoned by the March 25, 1992 NITU order. The STB granted this request on April 18, 1997.

---

5. The land at issue in the Grantwood Village action only constitutes a small portion of the Carondelet Branch. The exact amount of land in question is not relevant to the conclusions reached in this decision.

*Glosemeyer and Moore*

The Glosemeyers, plaintiffs in No. 93–126L, and the plaintiffs in No. 93–134L ("*Moore* plaintiffs")[6] own parcels of property along almost 200 miles stretching between Machens and Sedalia, Missouri. Until 1987, the Missouri–Kansas–Texas Railroad Company ("MKT") operated a railroad over plaintiffs' lands ("the Machens–Sedalia line") by virtue of right-of-way easements.[7] In September of 1986 the MKT filed an application with the ICC seeking to abandon railway service along the Machens–Sedalia line.

In its application for abandonment filed August 20, 1986, MKT sought to "abandon" the Machens–Sedalia line and "all operations thereover" and authority to dismantle the rail line. Application of Missouri–Kansas–Texas Railroad Company, I.C.C. Docket No. AB–102, at 2. As justification for its application, MKT stated:

> The line which [MKT] seeks to abandon is located on the north side of the Missouri River for a major portion of its length. As a consequence, the line is subject to flooding and other problems associated with its location so close to the river. The line does not generate enough local business to justify the continued maintenance and operation of the line. [MKT's] overhead traffic no longer moves over the line sought to be abandoned.

*Id.* at 2–3. The application went on to state:

> The rail [along the line] is mostly obsolete because of its age and the heavy loading characteristics of today's cars. Most of the bridges are designed for lighter car loadings, and there is an economic limit as

to how much these bridges can be strengthened. The trackage is difficult and expensive to maintain because of its physical characteristics and because of the almost annual flooding that takes place. In [MKT's] opinion, based on a cost and revenue study of traffic transported over the portion of line sought to be abandoned and including the cost of maintenance, it is not possible to operate said line profitably in the future.

*Id.* at 4.

On March 6, 1987, the ICC authorized abandonment of the rail line and on April 27, 1987, issued a CITU allowing for negotiation of an interim trail agreement covering the Machens–Sedalia line. On June 25, 1987, MKT entered into an agreement with the Missouri Department of Natural Resources ("MDNR") for trail use. By the terms of the agreement, MKT transferred to MDNR all interests it might have in the land comprising the Machens–Sedalia line for $200,000. MKT later removed all of the track from the Machens–Sedalia line. A recreational trail, known as the Katy Trail, is now operated over most of the former rail line.[8]

## DISCUSSION

The court will assume for the present that plaintiffs own the fee estate underlying the recreational trails. They allege that, but for the application of the Rails-to-Trails Act, they would enjoy full use of the surface because of the reversionary[9] interests they retained in these parcels. Absent the transfer of the use of the surface from the railroad

---

**6.** The court previously certified the plaintiffs in *Moore* as a class pursuant to R.C.F.C. 23. *See Moore v. United States,* 41 Fed.Cl. 394 (1998). The class consists of all landowners whose property is burdened by the recreational trail that has replaced the Machens–Sedalia line.

**7.** Defendant disputes whether the rights-of-way actually run across the *Moore* plaintiffs' lands and reserves the right to challenge the individual plaintiffs' interests. These disputes do not effect the conclusions reached here. The court assumes, for the purposes of this motion, that the rights-of-way do traverse the *Moore* plaintiffs' lands. Defendant is still free to litigate the issue of ownership of individual parcels of land. *See Moore,* 41 Fed.Cl. at 401.

**8.** Defense counsel conceded this at oral argument.

**9.** The use of the word "reversionary" is only descriptive. It refers to the plaintiffs' entitlement to control of the surface upon the extinction of the easement. It is not meant to describe the plaintiffs' legal interests in their lands. The plaintiffs have a present but non-possessory fee interest. They do not hold a "reversionary interest" in the strict common law sense of the word in that the interests are present as opposed to future. *See Preseault v. United States,* 100 F.3d 1525, 1533 (Fed.Cir.1996).

to the trail provider, in other words, their properties would no longer be burdened by rights-of-way; the easements would have be abandoned. Plaintiffs claim that this amounts to a taking of a new easement.

It is the thwarted termination of the railroads' rights-of-way—prevented and preempted by operation of the Rails–to–Trails Act—that gives rise to the potential takings claim. *See National Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F.3d 135, 139 (D.C.Cir.1998). That this Congressional preemption of state property law was not inadvertent is evidenced by the following statutory language: "in the case of interim use [as a trail] of any established railroad rights-of-way ... such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of such rights-of-way for railroad purposes." 16 U.S.C. § 1647(d). Congress has the power to impose its will in this manner;[10] if it extinguishes a property interest in the process, however, the Government must pay. *See Preseault*, 494 U.S. at 21, 110 S.Ct. 914 (O'Connor, J., concurring).

As Justice O'Connor noted in *Preseault*, real property rights arise from state law. *See id.* at 20, 110 S.Ct. 914 (O'Connor, J., concurring); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Therefore, when a federal court analyzes the effect of federal action on real property, it must utilize the law of the situs, *see Foster v. United States*, 221 Ct.Cl. 412, 420–21, 607 F.2d 943 (1979), in this case, Missouri. Whether the Rails–to–Trails Act effects a taking in these cases thus depends "upon the nature of the of the state-created property interest that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." *Preseault*, 494 U.S. at 24, 110 S.Ct. 914 (O'Connor, J., concurring). In other words, if the railway easements would have been extinguished but for the application of the Rail–to–Trails Act, then a new easement for a recreational trail has been imposed.

The Government argues that the question now before the court is simply whether "railbanking" pursuant to the Rails–to–Trails Act is a "railroad purpose" under Missouri law. While that question is an essential part of the inquiry, it can only be answered in the larger context of whether there was an abandonment under state law. If there was not, then there would be no taking, because the easements would continue to burden the plaintiffs' lands. If the court were to restrict itself to the abstract question of law posed by the Government, it would avoid adjudication of a *prima facie* element of the plaintiffs' claim. Plaintiffs, in other words, must establish that the railroad easements, absent the application of the Rails–to–Trails Act, would no longer burden the land, i.e. that they would have been deemed abandoned or otherwise extinguished under Missouri law. It is only as a defense to the larger question of abandonment that railbanking becomes relevant.

*Abandonment*

 Abandonment of an easement in Missouri is "proved by evidence of an intention to abandon as well as of the act by which that intention is put into effect; there must be a relinquishment of possession with intent to terminate the easement." *Dalton v. Johnson*, 320 S.W.2d 569, 574 (Mo.1959) (citation omitted). Application of that rule in the context of easements held by railroads was perhaps most clearly explained in *Kansas City Area Transp. Auth. v. 4550 Main Assoc., Inc.*, 742 S.W.2d 182 (Mo.Ct.App.1986):

Mere non-user of the easement will not extinguish the easement unless accompanied by an intention on the part of the owner of the dominant estate to abandon it. There must be an intention to abandon without an intention to again repossess it. The doctrine of abandonment will sometimes operate against railroads. When a railroad ceases to use for railroad purposes property over which it has an easement, the original owners [of the underlying fee estate] or their grantees thereafter hold the property free from the burden of the

---

**10.** As explained below, however, we cannot give full effect to this language insofar as it purports to dictate Missouri property law.

easement. Some Missouri cases dealing generally with abandonment of easements refer to relinquishment of possession as a necessary element of abandonment. *In the case of railroads, however, an easement for a railroad right-of-way is extinguished when the railroad ceases to run trains over the land.* The test for abandonment of an easement under Missouri law is therefore, non-user of the easement accompanied by conduct indicating an intention to abandon.

*Id.* at 189 (emphasis added) (citations omitted). The court further held that "abandonment of [an] easement is a necessary consequence when trains no longer are operated over the land on which the easement is claimed. An intention to abandon is inferred by the discontinuance of rail service with no prospect for resumption of service." *Id.* at 191.

While abandonment of a railroad easement is a question of fact which must be proven by clear and convincing evidence, *see Jordan v. Stallings,* 911 S.W.2d 653, 658 (Mo.Ct.App. 1995), the facts in most cases are straightforward. In *Jordan,* the court found that the removal of the "rails, ties and rail bed necessary for the operation of trains [was] obviously in furtherance of the railroad's intention to abandon [its] right-of-way" and that the easement was therefore legally abandoned. *Id.* at 659; *see also Moore v. Missouri Friends of the Wabash Trace Nature Trail, Inc.,* 991 S.W.2d 681, 688 (Mo.Ct.App. 1999). Similarly, where no trains had been run over the contested right-of-way for over twelve years and billboards and parking lots had been placed on the right-of-way, the court found those facts to be conclusive evidence of abandonment in *Kansas City Area Transp. Auth.,* 742 S.W.2d at 191.

The uncontested facts support a conclusion that the easements in the three cases at hand would have been treated as abandoned under Missouri law, and thus extinguished, but for the application of the Rails–to–Trails Act. In each instance there was both an intent to abandon rail service and acts in furtherance of that intent.

In all of these cases, the railroads' applications to the ICC for authority to abandon are clear evidence of intent to abandon their easements. *See Boyles v. Missouri Friends of the Wabash Trace Nature Trail, Inc.,* 981 S.W.2d 644, 649 (Mo.Ct.App.1998) ("[Railroad's] application for certificate of abandonment with the ICC together with its subsequent removal of the railroad tracks constituted evidence of its intention to abandon the railroad easement").[11] The applications are full of statements which unequivocally signify an intent to abandon. When a railroad's application for abandonment states that there is "no feasible alternative"[12] to abandonment, that it seeks to "physically"[13] abandon a rail line, or that it is "not possible to operate [a] line profitably in the future,"[14] a reader is left with no choice but to conclude that the railroad intends to abandon the rail line.

This intent was confirmed by conduct. The railroads here removed their tracks and ceased all operations. The fact that no trains have been run over these easements for years is strong evidence of abandonment. "[A railroad right-of-way] easement is extinguished when the railroad ceases to run trains over the land." *Schuermann Enterprises, Inc. v. St. Louis County,* 436 S.W.2d 666, 668 (Mo.1969) *(citing State Highway*

---

11. The Defendant cites *Hennick v. Kansas City Southern Ry.,* 364 Mo. 883, 269 S.W.2d 646 (1954) for the proposition that the application to the ICC should not be seen as evidence of an intention to abandon the right-of-way. The railroad there was seeking to convert its rail line to a short line railroad, outside the scope of ICC regulation; it did not intend, as did the railroads here, to cease operations altogether along the affected right of way. *See id.* at 651. As the court noted: "[T]here is no dispute that the actual track was left in place ... and was in place at trial time; a circumstance indicating that there was no intention ... to abandon the involved portion of the right-of-way." *Id. Hennick* bears little factual resemblance to these cases.

12. Missouri Pacific Environmental Report, contained within its Notice of Exempt Abandonment, dated January 21, 1992.

13. *Id.*

14. *Id. See also* Application of Missouri–Kansas–Texas Railroad Company, I.C.C. Docket No. AB–102, at 4.

*Comm'n v. Griffith,* 342 Mo. 229, 114 S.W.2d 976, 980 (1937)); *accord Boyles,* 981 S.W.2d at 648 (same). In all of these cases, as in *Jordan, supra,* everything necessary for the operation of a rail line—the rails, ties and rail bed—have been removed. *See also Moore,* 991 S.W.2d at 688 (removal of track clear evidence of abandonment).

Finally, the railroads in these cases actually rid themselves by conveyance of their entire legal interests in these easements. The trail providers, and not the railroads, are the owners of record of these "easements," and have modified the former rail beds. Conveying one's interest in land is clear evidence of abandonment, particularly when it is for a contrary purpose. *See Kansas City Area Transp. Auth.,* 742 S.W.2d at 190; *cf. Seventy–Ninth St. Improvement Corp. v. Ashley,* 509 S.W.2d 121 (Mo.1974) (offer to convey interest in land inconsistent with use of interest as right-of-way for railroad purposes and supportive of finding of abandonment).

These facts compel the court to find that the railroads intended to abandon, and in fact did abandon, their easements. There is no contrary evidence offered of any intent to begin the rebuilding process that would be necessary to run trains once again. As a matter of Missouri law, therefore, plaintiffs would have had immediate access to the surface, *see Chouteau v. Missouri Pac. Ry. Co.,* 122 Mo. 375, 22 S.W. 458, 460–61 (1893), had it not been for the application of the Rails–to–Trails Act. The remaining question, then, is whether, under Missouri law, the interception of the fee owners' right to possession by conversion of the railbeds to trail use precludes an abandonment—i.e. is either trail use or railbanking, or their combination, sufficient under state law to forestall plaintiffs' right to immediate possession? Only if this question is answered in the negative is the possibility of a taking presented.

*Trail Use*

The government argues that the use of the former rail line on an interim basis as a trail constitutes a railroad purpose. We disagree.

■ In Missouri, an easement granted for a particular purpose "terminates as soon as such purpose ceases to exist, is abandoned, or is rendered impossible of accomplishment." *Ball v. Gross,* 565 S.W.2d 685, 689 (Mo.Ct.App.1978). This applies to railroad right-of-way easements, which are held only for "railroad purposes." *Rombauer v. St. Louis–San Francisco Ry. Co.,* 225 Mo.App. 78, 34 S.W.2d 155, 156 (1931); *see also Jordan v. Stallings,* 911 S.W.2d 653, *supra.* Land or a right of way acquired by a railroad "may be used for any legitimate, incidental purpose that is reasonably necessary or convenient to the construction, maintenance, and operation of the railroad." *Rombauer,* 34 S.W.2d at 156.

The installation and maintenance of track, and the subsequent running of a train, over a stretch of land clearly constitutes a permissible railroad purpose. Even less direct uses, when they are related to operation of a railroad, have been permitted. The question is whether the use is incidental to the operation of trains. *See Hennick v. Kansas City Southern Ry. Co.,* 364 Mo. 883, 269 S.W.2d 646, 652 (1954). In *Rombauer,* a railroad maintained bunkhouses for its employees on its right-of-way easement. In holding that construction of bunkhouses was a use within the scope of the railroad's easement, the court stated held:

> [T]he question of whether or not a use, or proposed use, of its right of way by a railroad company is necessary for railroad purposes is, primarily at least, a matter to be determined by the [railroad] company itself in the exercise of its judgment, so that, in the absence of a showing that the use and occupancy is not necessary for railroad purposes, and that such use is in bad faith and not the result of the honest exercise of the company's judgment, the courts will be reluctant to interfere therewith.

*Rombauer,* 34 S.W.2d at 156.

Similarly, the placing of station grounds upon an easement was held to be a railroad purpose. *See Brown v. Weare,* 348 Mo. 135, 152 S.W.2d 649 (1941). *See also Quinn v. St. Louis–San Francisco Ry. Co.,* 439 S.W.2d 533 (Mo.1969) (railroad depot within scope of easement). Railroads may also transfer their interests in their right-of-way ease-

ments to other railroads, so long as the transferee railroad uses the right-of-way for railroad purposes. *See Hennick,* 269 S.W.2d at 653.

Although Missouri courts are reluctant to interfere with a railroad's own determination of an appropriate purpose, some uses have been prohibited. For example, in *Missouri–Kansas–Texas R.R. Co. v. Freer,* 321 S.W.2d 731 (Mo.Ct.App.1958), stockpiling sand and limestone along a railroad right-of-way was held not to be a railroad purpose, when the material was to be used in a concrete plant. *Id.* at 740. The terms of the easement dictated that it be used as a "railroad right of way ... in the maintenance of [the railroad's] roadbed and the operation of its trains." The court held that it would be "stretching the use beyond the contemplation of the parties to say that the instrument was intended to grant a right-of-way which could be used for the purpose of stockpiling sand and limestone and the mixing of it for the purpose of prosecuting a private business." *Id.* A use of an easement that is prohibited or otherwise beyond the scope of the easement causes the easement to terminate. *Chouteau,* 22 S.W. at 461.

The *Freer* court pointed out that several other uses had been held by a variety of jurisdictions *not* to constitute a railroad purpose: a tobacco warehouse, a cottonseed gathering house, a retail filling station, and a coal chute. *See Freer,* 321 S.W.2d at 738 nn. 15–19, 22. Similarly, the running of power lines over a railroad right-of-way easement, when those power lines were unconnected with the running of the railroad, was held to be a non-railroad use, and thus an impermissible additional servitude. *See Eureka Real Estate & Inv. Co. v. Southern Real Estate & Fin. Co.,* 355 Mo. 1199, 200 S.W.2d 328, 332 (1947).

Under this line of cases, trail use, by itself, would not constitute a railroad purpose. The transportation use contemplated by a railroad purpose would clearly be the movement of trains over rails. Recreational hiking, jogging and cycling are not connected with railroad use in any meaningful way.

A recent decision of the Missouri Court of Appeals, *Boyles v. Missouri Friends of the Wabash Trace Nature Trail, Inc.,*[15] dealt directly with conversion to trail use, confirming this analysis.[16] In *Boyles,* the railroad, Norfolk and Western Railway, operated a rail line over the contested right-of-way until 1984, when it applied for and received a certificate of abandonment from the ICC. *Id.* at 649. A short line railroad operated along the right-of-way for two additional years, but was unsuccessful, and the tracks were removed in 1988. *Id.* In 1993, the railroad sold its interest in the right-of-way to the Missouri Friends of the Wabash Nature Trail. *Id.* at 647. In 1996, the landowners filed suit to quiet title, alleging that the easement was extinguished by abandonment, and that therefore they owned the right-of-way in fee simple unburdened by the easement. *Id.* The defendant argued that trail use was a railroad purpose. The Missouri Court of Appeals disagreed:

> The term 'railroad purposes' ... does not encompass other forms of transportation, such as walking or bicycling, and the recreational purposes for which Wabash proposes to use the property do not fall within the commonly understood meaning of 'railroad purposes.'... The proposed development of a hiking, biking, cross-country skiing, and nature trail is completely unrelated to the operation of a railway and consistent only with an intent to wholly and permanently cease railway operations.

15. 981 S.W.2d 644 (Mo.Ct.App.1998), *reh'g and/or transfer denied,* December 22, 1998, *transfer denied,* January 19, 1999.

16. *Boyles* also dealt with easements obtained by condemnation, as opposed to purchase. Such easements are governed by Article I, section 26, of the Missouri Constitution, which provides, in pertinent part, that: "the fee of land taken for railroad purposes without consent of the owner thereof shall remain in such owner subject to

the use for which it is taken." The substantive law affecting prescriptive and non-prescriptive easements in Missouri is essentially the same. *Compare Boyles,* 981 S.W.2d 644 (holding prescriptive easement abandoned with cessation of railroad purpose) *with Kansas City Area Transp. Auth. v. 4550 Main Assoc., Inc.,* 742 S.W.2d 182 (Mo.App.1987) (holding easement obtained by conveyance abandoned by cessation of railroad purposes).

*Boyles,* 981 S.W.2d at 649–50 (citations omitted).

Other jurisdictions have reached the same result. *See, e.g., Preseault v. United States,* 100 F.3d 1525, 1542–44 (Fed.Cir.1996) (applying Vermont law); *Lawson v. Washington,* 107 Wash.2d 444, 730 P.2d 1308 (1986) (holding that conversion of railroad rights-of-way to recreational hiking trails effected a taking under the state constitution); *Pollnow v. Department of Natural Resources,* 88 Wis.2d 350, 276 N.W.2d 738 (1979) (holding that recreational trail was not within the scope of a railroad right-of-way easement).[17] It is therefore clear that under Missouri law, trail use is not a railroad purpose. Use of the easements as trails is thus not enough, by itself, to forestall abandonment.

*Railbanking*

■ The Government argues, however, that the trails were not simply intended for a current recreational purpose, but were also meant to keep the existing corridors intact for potential future rail service over the same routes. Defendant argues that railbanking is a railroad purpose under state law and that the easements thus should not be deemed abandoned. It contends that holding out the possibility of a reactivation, even if remote and indefinite, is a railroad purpose in and of itself. This future potentiality thus becomes a present railroad purpose in the view of the Government and the amicus.

There is no question that this potentiality, insofar as these particular easements are concerned, exists purely in the realm of the hypothetical. No evidence was offered of a present intent to reinstate rail service in the future.[18] Cases discussed in connection with abandonment seem [19] to make it clear that such contingent possibilities do not forestall abandonment. *See Kansas City Area Transp. Auth.,* 742 S.W.2d at 190 (undisputed evidence showed that future railroad use was unrealistic and that actual use of right-of-way was unrelated to railway operation; court held allegation that right-of-way was being held for future railway use insufficient to forestall abandonment).

Defendant cites *Hennick v. Kansas City Southern Ry. Co.,* 364 Mo. 883, 269 S.W.2d 646 (1954), in support of its argument. *Hennick* dealt with a conveyance from a regulated to an unregulated user and a conversion from an ICC-regulated rail line to a short line railroad. At the time in question, the railroad was not running trains over a portion of the tracks. *Id.* at 649–50. The court concluded that these facts were not conclusive evidence of a permanent discontinuance of railroad purposes. *Id.* at 653. It held that a temporary discontinuance will not extinguish an easement while the railroad plans for the future.

*Hennick* is no support for railbanking. Shortly after approval of abandonment, the railroad there negotiated a transfer to a new user. The tracks were never dismantled and the transfer in that case was merely to an unregulated railroad. The transferee intended to operate a short line railroad, not a recreational trail. The *Hennick* court noted that the abutting landowners could not complain because the use made of the land was

---

17. We recognize that other courts have held differently. *See, e.g., Chevy Chase Land Co. v. United States,* 355 Md. 110, 733 A.2d 1055 (1999) (holding use of right-of-way as recreational trail was within scope of railroad easement); *Washington Wildlife Preservation, Inc. v. Dept. of Natural Resources,* 329 N.W.2d 543 (Minn.1983) (holding that use of railroad right-of-way as recreational trail did not constitute abandonment of right-of-way).

18. We recognize that service was reinstituted over a small portion of the Carondelet Branch in Grantwood Village. No evidence was offered, however, of a present intent to reopen any additional track, either at the time of abandonment or at the present.

19. Unfortunately, there is no reported Missouri decision which addresses squarely the issue of whether railbanking is a railroad use of a right-of-way under Missouri law. Normally, we would prefer to certify such an important and undecided question directly to the highest court of the state. *See, e.g., Chevy Chase Land Co. v. United States,* 158 F.3d 574 (Fed.Cir.1998) (certifying questions of Maryland state law to Court of Appeals of Maryland). Unfortunately, Missouri does not have a process by which federal courts can certify questions for decision by the Missouri Supreme Court. *See Grantham v. Missouri Dept. of Corrections,* 1990 WL 602159 (Mo.). Thus, we must apply Missouri law as we find it. *See Delaune v. United States,* 143 F.3d 995, 1001 (5th Cir.1998).

not "entirely different" from the use contemplated by the easement. *Id.* at 653. Here the transfer was to entities wholly unconnected with rail operations. It is worth noting that the court in *Hennick* distinguished its facts from a situation closer to the facts at bar:

> [N]onuser of a right or privilege may be of such a duration that such nonuser, along with other facts, may constitute an abandonment; and this, irrespective of a later declared purpose of the grantee to exercise its rights ... at some indefinite future time.

*Id.*

More nearly on point is the decision of the intermediate Missouri appellate court in *Boyles.* The court there was faced with the argument that one of the purposes of the recreational trail was "to keep the existing corridor intact for transportation needs that may occur in the future, such as reactivated rail service." *Boyles,* 981 S.W.2d at 649. The court rejected that argument with little discussion, saying that future railroad use was simply unrealistic. *Id.* at 650. The interim use in *Boyles* was, admittedly, not prompted by a Rails–to–Trails Act conversion. And, unlike the present circumstances, the railroad had applied for and been granted a certificate of abandonment by the ICC eight years prior to the attempted transfer to the trail user. In that sense, the court's statement, quoted above, may well have been *dicta.* If the abandonment was complete before the attempted transfer, there would have been nothing for the railroad to transfer. Nevertheless, this language provides a clear suggestion that Missouri courts view railbanking as a non-railroad purpose. There is no reason to think that this view is inconsistent with prior Missouri decisions.

In sum, neither component of railbanking—the preservation of the rail line for future use nor the "interim" use of the easement as a recreational trail—constitutes a railroad purpose under Missouri law. These easements, therefore, would have been extinguished except for federal preemption of Missouri law.

*Was there a taking?*

■ Having established that the easements would have been extinguished, and thus that, but for the application of the Rails–to–Trails Act, the plaintiffs would have been seised in their lands without any restrictions, we have little difficulty concluding that a taking has occurred. In this case, the plaintiffs came into possession of their lands realizing that MoPac and MKT, or an appropriate railroad successor, had the right to operate a rail line across parts of their lands. Plaintiffs would have been secure in the knowledge that Missouri law guaranteed that only railroads had that right and that the only uses that could be made of their lands were those reasonably related to the operation of a railroad. When the railroads ceased operations, plaintiffs would own the land free of any easements.

Those expectations have been thwarted. Solely because of the operation of the Rails–to–Trails Act, plaintiffs' lands are now burdened by new easements-for recreational trails. Whereas previously the plaintiffs could exclude all but the railroads from use of the right-of-ways, now the public at large has access. This is a physical taking of the plaintiffs' property. "The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. [T]he permanent physical occupation of property forever denies the owner any power to control the use of the property." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–36, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). As Justice Scalia has noted:

> To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather 'a mere restriction on its use' is to use words in a manner which deprives them of all their ordinary meaning. [A] permanent physical taking has occurred ... where individuals are given a permanent and continuous right to pass to and fro, so that real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises.

**782**

*Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831–32, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). *See also Kaiser Aetna v. United States,* 444 U.S. 164, 176, 180, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). This is precisely what has happened in these cases. Through the agreements consummated between the railroads and trail providers, trail easements have been imposed, essentially in perpetuity, contrary to state law and simply by federal fiat.

The likelihood that the Rails–to–Trails Act was motivated by a commendable interest in public recreation or was an exercise in great foresight is immaterial. Rights in private property are more durable than the current majority's notion of what constitutes a worthy cause. As Justice Holmes said in *Pennsylvania Coal Co. v. Mahon,* "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed. 322 (1922). *See also Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (the "Fifth Amendment's guarantee ... [is] designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

## CONCLUSION

Summary judgment on the issue of liability is granted in favor of the plaintiffs. The defendant's corresponding cross-motions for summary judgment are denied. The cases are unconsolidated. The parties in *Glosemeyer* and *Grantwood Village* are directed to file joint status reports on or before February 25, 2000, proposing further pretrial proceedings. Pending procedural motions in *Moore* will be separately addressed.

